# EXHIBIT 7

U #4

### Beth Israel Medical Center
Level 3 Bargaining Committee
February 21, 2002

Beth Israel Medical Center and the RN Division of 1199, SEIU, used an Interest-Based Bargaining Process to address and resolve the following issue statement:

"How do we develop and maintain a staffing system that meets the needs of the RN's and the hospitals for consistency and predictability of scheduling and maintain appropriate staffing that ensures that the "right RN" is on the "right unit" at the "right time" consistent with staffing ratios already agreed upon?

> A. How can we effectively respond to patient (e.g. census, acuity, etc) and staff (e.g. absences) fluctuations while providing RN's with more control over their work environment?
> B. How do you reduce and better manage stress in the workplace? (Also a recruitment and retention issue!)
> C. How do we maintain quality of patient care given the scarcity of resources (e.g. personnel, fiscal limitations, etc)?
> D. How do we reduce the need for overtime (mandatory and voluntary)?"

The parties engaged in these discussions with the goal of reducing the need for overtime and the goal of eliminating the need for mandatory overtime.

The parties identified the causes of these problems to be: vacancies created by LOA's, difficulty recruiting registered nurses; unpredictability of staffing because of sick calls; and acuity fluctuations.

The parties crafted the solutions set forth below to accomplish these goals as modifications to the collective bargaining agreement between the Union and the Beth Israel Medical Center:

Self Scheduling

Consensus on the following:

The collective bargaining agreement will include the following policy statement:

Beth Israel Medical Center allows for self-scheduling subject to approval by nursing management and the staffing needs of the unit.

It was noted that Level 2 approved self-scheduling recommendations.

Voluntary Coverage for Weekends

Consensus on the following:

A registered nurse who volunteers to work on an extra weekend day instead of a regularly scheduled weekday will receive an additional 25 % in compensation over his/her regular hourly rate of pay for each straight time hour worked on the weekend day instead of the weekday. Voluntary days are not credited against EOWO obligations.

Leave of Absence

Consensus on the following:

1. Employees are eligible to take leaves of absence as defined in the contract. An employee who returns to work from an approved *involuntary* leave of absence will be reinstated to his or her former job depending on the length of the leave and the length of service of the employee as follows:

| Length of Service | Maximum period of time position will be held for the employee. |
|---|---|
| Initial period of eligibility up to 5 years of service | 6 months |
| 5 years to 10 years | 9 months |
| 10 to 15 years | 12 months |
| 15 to 20 years | 18 months |
| 20 or more years | 24 months |

2. Maternity remains as it is in the current contract.

2

Leave of Absence (continued)

3. RN's on Worker's Compensation will be reinstated to their former position upon return from disability as follows:

Up to 10 years of service          12 months

10 years or more of service        24 months

4. After the time limit expires and the nurse's position is filled, the nurse would have the choice of scope and/or shift from available vacancies. Training would be provided, if requested, for the RN to move into a new position.

Hospital Internal Traveler Pool
Post Positions by July 1, 2002

Consensus on the following:

1. Core level of staff (FTE's) based on previous experience level of LOA's is as follows:

> Petrie – 22 FTE's
> King's Highway – 7 FTE's
> Singer – 11 FTE's

2. We want to induce in-house experienced staff in the Hospital Internal Traveler and then fill resulting vacant permanent positions on units but this does not preclude "experienced" new hires becoming Hospital Internal Traveler.

3. The Hospital Internal Traveler is primarily for filling LOA's but may be used to cover other holes before use of overtime if no other LOA slot is available.

4. Separate unit seniority for vacations. Once vacations are established RN will advise unit manager of vacation schedule upon assignment to unit.

5. Length of assignment promotes stability by assigning longest term possible unless superceded by unit staffing needs.

6. Assignments based on qualifications/scope.

7. Cross training is an option available to RN (med surg plus 1 specialty to be discussed by local QPIP)

8. May have choice to work flexible schedules based on bid.

9. Must be flexible to assume LOA's weekend schedule. The employer will make every effort to schedule EOWO in transition to LOA's schedule.

10. If there is an unassigned Hospital Internal Traveler available to work they should first be used to avoid mandated overtime, then to cover voluntary overtime provided rules covering canceling voluntary overtime are followed.

3

## Hospital Internal Traveler (continued)

11. During LOA assignment:
    - Vacation by Hospital Internal Traveler pool unit seniority
    - Holidays – assignments of 2 months or more the unit manager will integrate Hospital Internal Traveler into unit schedule (The Hospital Internal Traveler will adopt the LOA's Holiday schedule).
    - Mandatory overtime as part of unit
    - Floating as part of unit
12. Minimum assignment of 1 year
13. Hire for Day/Evening/Night shift. No rotating shifts. Post Hospital Internal Traveler positions for specific shifts.
14. PACU is in Critical Care for the purpose of Hospital Internal Traveler
15. If a Hospital Internal Traveler is otherwise assigned they will be reassigned to an LOA when LOA's occur.
16. Posting will be as inclusive as possible to encourage cross movement and broad application.
17. Objective assessment of "appreciable difference" with respect to seniority.
18. RN can bid for a Hospital Internal Traveler position in specialty without current qualification and they will be trained.
19. Where we have a shift mix (flex and conventional) no RN would be forced to work evenings (no rotation).
20. You can't exercise your option to cross train until you have 2 years of relevant acute care experience.
21. A Hospital Internal Traveler will be compensated for dual certification when achieved per contract.
22. Incumbents will receive bonus payments (50%) upon entering the Hospital Internal Traveler pool and at the end of the first year (50%). New hires will receive bonus payments (50%) at 6 months and at the end of the first year (50%). Subsequent years' bonus payments (50%) will be paid every 6 months thereafter for the term of the agreement.
23. Existing lateral transfer language applies to RN's movement from unit to Hospital Internal Traveler position.
24. The Bonus Payment will be $ 5,000 paid (see #22) in a separate check.

## Transit Check

Consensus on the following:

An RN from each hospital will serve on a joint committee to discuss implementation of this program which will meet within 2 weeks of signing of this agreement.

<u>Flex Units</u>
Implement no later than June 15, 2002

*Petrie:  8 Linsky, 8 Silver, 5 Dazian*
*Singer: Neuro – 11th Floor, Neuro SD, Neuro ICU*
*         Peds – 10th Floor, SD, ICU*
*King's Highway – 2 North, SSU, 3 East (13, 11.5 hour shifts in 4 weeks model/12*
*hours inclusive of 30 minutes unpaid lunch)*
*Surgical Services -In the Operating Room, of the existing budgeted positions 3 will be*
*converted to flex at Petrie (13, 11.5 hour shifts in 4 weeks model) and one each at*
*Singer and KHD (10 hr shift)*

<u>Maternal/Child Health</u>

Consensus on the following:

RN will be cross-trained to meet the needs in all areas of the scope of practice.

<u>Per Diem</u>

Consensus on the following:

1.  The cap on the use of per diems would be raised to 195 hours (26 shifts at 7.5, 17 shifts at 11.5) in 13 weeks.

2.  Per diems will be required to be available to work weekends and at least one winter and one summer holiday.

3.  Seniority for per diems at Beth Israel Singer and Petrie
    -  A per diem employee shall not accrue seniority under Article 9 of the collective bargaining agreement for time worked as a per diem employee.
    -  However, when a per diem employee applies for a regular position, time in per diem status shall be considered in determining ( between or among per diem employees) which per diem employee has the most seniority.
    -  If a per diem employee is converted to regular status seniority accrual shall begin on the date of conversion to such status.

4.  When data indicates that the pattern of per diem usage on a particular unit indicates that there is a need for a regular pert-time position, such issue shall be referred to the Jobs Committee.

Per Diem (continued)

5. *Per diem pay increased at Petrie and Singer Divisions as follows:*

| | Days | Evenings/Nights |
|---|---|---|
| Monday – Friday | $35 | $37 |
| Saturday & Regular Holidays | $36 | $38 |
| Sunday | $37 | $39 |
| Holidays (New Years, Labor Day, Thanksgiving, Christmas) | $37 | $39 |

*Per diem pay at KHD will remain the same:*

| | Days | Evenings/Nights |
|---|---|---|
| Monday – Friday | $35 | $37 |
| Saturday & Regular Holidays | $37 | $38 |
| Sunday (New Years, Labor Day, Thanksgiving, Christmas) | $39 | $39 |

Sick Buyback

Consensus on the following:

Annual Sick Buyback

1. Basic Plan – RN's may elect to:

- Bank 1 day during first 6 months and get paid for up to 5 days.

- Bank 1 day during second 6 months and get paid for up to 5 days.

2. Payout dates: July 15 and January 15

Payment of Banked Sick Days Upon Voluntary Separation

This was addressed at Level 2.

Staffing Guidelines

Consensus on the following:

1. The staffing guidelines signed off April 2001 are incorporated in this agreement except as modified as follows:

- Singer 8th Floor – 1:7 on all shifts. The parties will jointly monitor the acuity of telemetry patients in this unit to ensure that appropriate care hours are maintained.

- Singer 7th Floor Rehab – When swing beds are used Additional RN will be provided.

- ICU units will be include the following footnote - * 1:1 as appropriate

- Petrie – 3, 5, 7, 9 Bernstein – Nights 1:13

## Staffing Guidelines (continued)

- Petrie – 6 Karpas  Correct Evenings to 1:10

- King's Highway – 2West Days 1:7, Evenings 1:7, Nights 1:9

- Statement in guidelines:  Staff each unit based on anticipated census for the next shift.

- King's Highway ED staffing enhancement will be achieved consistent with the flexible staffing criteria.

2. Staffing guidelines for Flex units:

| King's Highway | Days | Nights |
|---|---|---|
| 2 North | 1:7 | 1:8 |
| 3 East | 1:7 | 1:7 |
| SSU | 1:3 | 1:3 |
| Petrie | | |
| 5 Dazian/5 Karpas | 1:6 | 1:6 |
| 8 Linsky | 1:6 | 1:6 |
| 8 Silver Floor | 1:7 | 1:7 |
| 8 Silver SD | 1:4 | 1:4 |
| Singer | | |
| 11th Floor | 1:6 | 1:6 |
| NICU | 1:2 | 1:2 |
| NSTD | 1:4 | 1:4 |
| 10th Floor | 1:5 | 1:5 |
| Ped SD | 1:4 | 1:4 |
| Ped ICU | 1:2 | 1:2 |



<u>Floating (Page 70, 2b)</u>

Consensus on the following:

This language the hospital has to follow unless there is an RN in excess of the established guideline available to be floated under the collective bargaining agreement.

Paragraph 2b shall be modified to reflect the following order: (1) float pool (where one exists); (2) per diem; (3) voluntary overtime; and (4) agency.

<u>Surgical Services</u>

The parties agree that a subcommittee of the negotiating committee will meet before contract ratification. This subcommittee will be composed of management and surgical services RN's from all three sites and will discuss the specific implementation of the provisions of this agreement to surgical services as well as other surgical specific issues remaining in these negotiations utilizing an Interest-Based process.

<u>Joint Union/Management Evaluation</u>

Consensus on the following:

1. It is agreed that the parties will meet periodically, no less often than quarterly, to discuss whether the agreed upon solutions have led to the goals set forth above.(Measurement QPIP Project starting 2nd quarter of 2002)

2. The parties, through the appropriate committee(s), will identify and collect data sufficient for them to evaluate the results in the following areas:

    A. Leave of Absence/Hospital Internal Traveler Pool Implementation & Utilization
        • Impact of implementation (consistently implemented)
        • Vacancy levels
        • Holes in the schedule

    B. Voluntary Overtime/Mandatory Overtime
        • Overtime worked both voluntary and mandatory
        • Where – what unit
        • Causes of overtime in unit

    C. Sick Buyback
        • Reduction in sick time
        • Reduction in overtime directly related to sick call
        • Reduction in agency utilization
        • Cost analysis

- Weekend coverage
- Patterns of usage

D. Self-Scheduling
  - Weekend coverage
  - Non-Designated Holiday coverage

E. Flex
  - Sick calls
  - Patient/Family satisfaction

Joint Union/Management Evaluation (continued)
  - Quality care indicators

F. Per Diem Utilization
  - Per diem versus part-time usage

G. Replacement Factor
  - Data sufficient to calculate actual usage of leave days that are part of the replacement factor.

3. In the evaluation of solutions the parties agree that no one element of data will be determinative regarding the impact of agreed-upon solutions.

4. If either party fails to implement the solutions listed above that constitute modifications to the collective bargaining agreement either party shall have the right to seek expedited arbitration of the matter in accordance with AAA rules.

5. If the solutions set forth above, once implemented, do not enable the parties to reach their goals, or if a new problem pertaining to the issue statement is identified that requires resolution, the parties shall meet and develop a new solution to the problem using the Interest-Based process. Either party may raise issues relative to the solutions agreed upon herein at any time during the term of this agreement. Anything in this Agreement to the contrary notwithstanding, absent a mutually agreeable resolution neither party is required to agree to, nor shall an arbitrator have the authority to order, a modification of the provisions of this Agreement.

AGREED

1199 SEIU National health & Human
Services Employees Union

By _____
Norman Amsterdam, RN, MA
Executive Vice President, RN Division

Beth Israel Medical Center

By _____

# EXHIBIT 8

AMERICAN ARBITRATION ASSOCIATION
VOLUNTARY LABOR ARBITRATION TRIBUNAL

---

| | |
|---|---|
| IN THE MATTER OF ARBITRATION<br><br>between<br><br>LOCAL 1199,<br><br>        **UNION**<br><br><br>BETH ISRAEL MEDICAL CENTER,<br><br>        **EMPLOYER**<br><br>Re:  Failure to pay night shift differential<br>       to Registered Nurses<br><br>Case No. 13 300 02379 05 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

                                         **OPINION**
                                            **AND**
                                          **AWARD**

---

Before:  Robert T. Simmelkjaer, Esq.

BETH ISRAEL MEDICAL CENTER

MAR 2 2 2007

HUMAN RESOURCES

## APPEARANCES

### FOR THE UNION

Barry J. Peek, Esq., Meyer Suozzi English & Klein, P.C.

### FOR THE EMPLOYER

Melissa Greiner, Esq., Manager, Labor & Employee Relations
Carmen Suardy, Assistant Vice President, BIMC

## BACKGROUND

Pursuant to the provision for arbitration contained in the collective bargaining agreement between the League of Voluntary Hospitals and Homes of New York, including its affiliated Beth Israel Medical Center (hereinafter "the Employer" or "Beth Israel") and Local 1199/SEIU National Health and Human Service Employees Union (hereinafter "the Union" or "Local 1199"), covering the period commencing May 1, 2005 to April 30, 2011 (Jt. Ex. #1), a hearing was held on April 7, 2006 and December 13, 2006. The purpose of the hearing was to arbitrate the class action grievance of the Union regarding the alleged failure of the Employer to pay a night differential to nurses assigned to the twelve (12) hour "flex" shift at the Kings Highway Division.

The Arbitrator derives his jurisdiction from ARTICLE XXXII – ARBITRATION.

At the hearing, the parties were given ample opportunity to present their respective positions, including testimonial and documentary evidence. The record consists of one (1) Union Exhibit, eleven (11) Employer Exhibits, and six (6) Union Exhibits. In addition, the Employer submitted a post-hearing brief and the Union a Memorandum of Law, dated January 12, 2007. Beth Israel submitted a reply brief dated January 26, 2007, and Local 1999 submitted a reply brief dated January 30, 2007. The evidence so submitted as well as the arguments of the parties have been fully considered in the preparation of this opinion and award.

ISSUE:  Did the Employer violate the CBA when it ceased to pay night shift differential to Registered Nurses at the Kings Highway Division who worked the 7 a.m. to 7 p.m. flex schedule?
And, if so, what shall be the remedy?

## RELEVANT CONTRACT PROVISION

### 2002 Agreement

**Flex Units**
Implement no later than June 15, 2002

Petrie:  8 Linsky, 8 Silver, 5 Dazian
Singer:  Neuro-11th Floor, Neuro, SD, Neuro ICU
        Peds-10th Floor, SD, ICU
Kings Highway-2 North, SSU, 3 East (13, 11.5 hour shifts in 4 weeks model/12 hours inclusive of 30 minutes unpaid lunch)
Surgical Services – In the Operation Room, of the existing budgeted positions 3 will be converted to flex at Petrie (13, 11.5 hour shifts in 4 weeks model) and one each at Singer and KHD (10 hour shift)

(U. Ex. #4).

## STATEMENT OF FACTS

1) Since on or about 1980, Local 1199 has been the representative for nurses employed at the Kings Highway Hospital.  In 1988, Local 1199 and Kings Highway Hospital entered into an agreement ("1988 MOA") which created twelve (12) hour shifts (i.e. "flex time") for Registered Nurses assigned to the Critical Care Unit ("CCU") and Intensive Care Unit ("ICU").  The flex schedule was initiated as a Pilot Program and in six months, "if the Hospital and Registered Nurses agree, 12 hour shifts will be considered the permanent staffing pattern for the units involved unless changed by further contractual agreement."

The 1988 MOA further stated:

(2) The work week will consist of three 12 hours tours of duty.  No nurse shall be scheduled to work more than two (2) consecutive days in a row, except when mutually agreed.

(3) Shifts will be 7:00 A.M. to 7:00 P.M. and 7:00 P.M. to 7:00 A.M. Night differential will start at 7:00 P.M. (U. Ex. #1).

2) On December 22, 1989, the parties entered into a MOA which extended the contract until October 31, 1999 ("1989 MOA"). Section 8 of the 1989 MOA stated, inter alia, the following:

> 8. Those Registered Nurses who work a 12 hour shift (flex time) which includes the hours of 3:00 P.M. to 7:00 P.M. shall be paid the above 10% shift differential for those hours worked between 3:00 P.M. and 7:00 P.M. (U. Ex. #2).

3) Based on the foregoing 1989 MOA, RNs working the 12 hour flex schedule at Kings Highway Hospital received a night shift differential for hours worked between 3:00 p.m. and 7:00 p.m. from 1989 until 2002.

4) On November 10, 1991, Local 1199 and Kings Highway Hospital entered into a 1991 MOA which extended and modified the prior contract until October 31, 1992. The 1991 MOA addressed the night shift differential as follows:

> 8. Those Registered Nurses who work a 12 hour shift (flex time) which includes the hours of 3:00 P.M. to 7:00 P.M. shall be paid shift differential on a pro-rata basis for those hours. (U. Ex. #3).

5) In 1994, the Kings Highway Hospital was purchased by Beth Israel and following the merger was known as the Kings Highway Division of Beth Israel. The only units of the Kings Highway Hospital RNs on flex schedules pursuant to the 1991-1992 Agreement ("1991 MOA") were the ICC and CCU Units and the Emergency Department ("ED"). Those nurses continued to receive a pro-rata differential as per the 1991 MOA for hours worked between 3:00 p.m. and 7:00 p.m. – even if the nurse was assigned to the 7:00 a.m. to 7:00 p.m. shift.

6) At the time of the 1994 merger and continuing thereafter, Beth Israel was composed of the Petrie Division, the Singer Division (which closed in August 2004) and the Kings Highway Division. The Petrie Division, which had been part of Beth Israel prior to the merger, also instituted 12 hour flex shifts in 1988. The night shift differential language in the BIMC/Local 1199 1988 Agreement reads as follows:

"All Nurses working twelve hour shift arrangements whose regular hours end after 7 p.m. shall receive pro-rated shift differential from the beginning of the regular evening shift." (Emphasis added) (E. Ex. #11).

7)  The Petrie Division's flex schedule provided for thirteen (13) 11.5 hour shifts, inclusive of a thirty (30) minute <u>unpaid</u> lunch. The Kings Highway flex schedule provided for three (3) 12 hour shifts, inclusive of a thirty (30) minute <u>paid</u> lunch. At Kings Highway, every sixth (6th) week a paid holiday would be earned but not taken to make up for a shortfall in hours worked per week.

Also, nurses at Kings Highway were scheduled to work every third weekend whereas nurses at Petrie were scheduled to work every other weekend.

8)  The 2001 MOA established a processed called "Interest Based Negotiations." The negotiating structure in 2001 took place on three (3) levels: Level I – Industry Negotiations ("economic terms negotiated in the Master Agreement for all 1199-represented employees…"); Level 2 – multi-employer RNs bargaining to address all issues affecting nurses; Level 3 – local issues affecting a specific institution.

9)  The preamble to the Level 3 Staffing and Scheduling session states:

How do we develop and maintain a staffing system that meets the needs of the RN's and the hospitals' for consistency and predictability of scheduling and maintain appropriate staffing that ensures that the "right RN" is on the "right unit" at the "right time" consistent with staffing ratios already agreed upon?

Among the Management Interests was: "Ability to flex staffing with changing volumes and security" (E. Ex. #3). Also, the bargaining notes prepared by one of the facilitators who attended the Level 3 bargaining session on June 13, 2001 states, under brainstorming options, "flex time design our own" (E. Ex. #4).

10) During the time period where the Level 3 bargaining was being conducted, Arbitrator Richard Adelman issued an award on the parties' flex schedule agreement. Arbitrator Adelman held that the Hospital was required to continue to pay nurses for their meal breaks because not only did Paragraph 2 of the Flex Schedule provide that "the work week will consist of 12 hour tours of duty" and Paragraph 3 state that "shifts will be 7:00 a.m. to 7:00 p.m. and

7:00 p.m. to 7:00 a.m.," but also Paragraph 4 states "shifts will include ½ hour meal break and three (3) fifteen minute coffee breaks." He further found that unlike the general agreement "which defines the regular workday as 'exclusive of an unpaid lunch period,' the Flex Schedule agreement contains no such language...thereby clearly showing that it was the parties' intention to pay for the meal break as part of the nurses' 12-hour flex shift" (E. Ex. #5).

11) Interest-Based bargaining sessions continued on August 7-8, 2001 with "flex schedules (as a related option to improve retention and recruitment)" is a subject for discussion.

12) The February 21, 2002 Agreement described "solutions" crafted by the parties "to accomplish goals as modifications to the CBA." With respect to "Flex Units," they were as follows:

> Flex Units
> Implement no later than June 15, 2002
>
> Petrie:  8 Linsky, 8 Silver, 5 Dazian
> Singer: Neuro – 11th Floor, Neuro SD, Neuro ICU
>        Peds – 10th Floor, SD, ICU
> King's Highway – 2 North, SSU, 3 East (13, 11.5 hour shifts in 4
> weeks model/12 hours inclusive of 30 minutes unpaid lunch)...
> (U. Ex. #4).

13) Following execution of the 2002 Agreement, nurses at the Kings Highway Division continued to receive the night differential while working the flex shift, even for shifts ending after 7:00 p.m., from October 2002 to August 2005. When Beth Israel "discovered the error, it notified the Union and the payments were stopped" (Testimony of Dallas Piana).

14) The Flex Schedules in the ED, ICU and CCU Units, encompassing the 3 p.m. to 7 p.m. night shift differential, were put in place at Kings Highway Hospital in the 1989 MOA before it was purchased by Beth Israel. The flex schedule was implemented in the 2 North, SSU and 3 East Units pursuant to the 2002 Agreement.

15) In response to the Employer's decision to discontinue the payment of night shift differential to nurses assigned to the flex units at Kings Highway Hospital from 7:00 a.m. to 7:00 p.m., effective August 7, 2005, Local 1199 filed a grievance and a subsequent Demand for Arbitration.

7

## CONTENTIONS OF THE PARTIES

### UNION POSITION

The Union, which has the burden of proof in a contract interpretation grievance, has argued that the Employer has violated the CBA by failing to pay the shift differential to RNs at the Kings Highway Division assigned to work a 12 hour flex shift, 7:00 a.m. to 7:00 p.m.

Initially, the Union contends that the "contract language is clear and unambiguous" in that the benefit at issue has been "clearly set forth in various collective bargaining agreements" and MOAs for more than 15 years. In reviewing the written agreements between Local 1199 and Kings Highway Hospital, the Union maintains that commencing with a six month Pilot Program in 1988, nurses working the 12 hour shift, known as the "flex shift," from 7:00 a.m. to 7:00 p.m. and from 7:00 p.m. to 7:00 a.m. were paid a night shift differential for the hours worked after 7:00 p.m.

Citing the 1988 MOA language, which provided for the permanent establishment of the 12 hour flex shifts, the Union notes that the language indicated that the night shift differential would be paid only for hours worked after 7:00 p.m. Subsequently, the 1989 MOA, Paragraph 8, amended the night shift differential to provide that nurses who worked a flex shift between the hours of 3:00 p.m. to 7:00 p.m. "shall be paid the above 10% shift differential for those hours worked between 3:00 p.m. and 7:00 p.m." (U. Ex. #1, #2).

According to the Union, the only other reference to the payment of shift differential is contained in the 1991 MOA between Local 1199 and Kings

Highway Hospital wherein a change was made in the way the pro-rata shift differential was paid.

Absent contract language to the contrary, the Union argues that the 1988, 1989 and 1991 MOAs should suffice in terms of express, unambiguous contract language, thus obviating the need for any parol or extrinsic evidence.

Assuming arguendo that the night shift differential language continued in the prior MOAs is deemed ambiguous, the Union argues that "the 2002 Agreement did not change the Employer's obligation to pay the shift differential to the Registered Nurses at Kings Highway Hospital who worked the 7:00 a.m. to 7:00 p.m. 12 hour flex shift." In the Union's view, "the 2002 Agreement represents an agreement that the flex schedules and payments for working those shifts in both the Kings Highway Division and Petrie Division would be exactly the same."

Although the Petrie Division of Beth Israel prior to the merger implemented a 12 hour flex schedule in 1988 providing a shift differential only for nurses whose regular hours "end after 7 P.M.," the Kings Highway night shift differential was distinguished by paying nurses who worked the 7:00 a.m. to 7:00 p.m. flex shift a pro-rata portion of the shift differential from 3:00 p.m. to 7:00 p.m.

The Union maintains that these contract provisions were reinforced by a 15-year practice, including a 3-year practice of payment following the execution of the 2002 Agreement from October 2002 to August 2005.

Notwithstanding the Union's participation in the Interest-Based negotiations leading up to the 2002 MOA and the Level 3 – local negotiations

regarding the shift differential, the Union concludes that "none of the (bargaining) notes offered by the Employer, or in any agreements reached as the result of the Interest-Based bargaining, is there any reference whatsoever to the payment of the shift differential."

Whereas the parties agreed to change the flex schedule at the Kings Highway Division to include a thirty (30) minute unpaid lunch to accommodate the Adelman Award, which sustained a grievance upholding a thirty (30) minute paid lunch, the parties made no changes to the method in which the shift differential was to be paid.

After reviewing case law with respect to the interpretation of contract language and declaring the testimony of Ms. Suardy to be "self-serving," the Union argues that in order to find for the Employer the Arbitrator "would have to rewrite the language that presently governs that benefit," contrary to the contractual prohibition denying the Arbitrator any authority to rewrite the parties' contract language.

The Union takes issue with the Employer's assertion that the ultimate refusal of Patricia O'Brien, a Local 1199 representative, to sign the Level 4 MOA, namely the crossing out of her signature, could be construed as her objection to the parties' agreement to implement the Petrie Model, including its method of paying the night shift differential. The document was later signed by 1199 Vice President Norma Amsterdam on June 4, 2002. Inasmuch as the Level 4 MOA makes no reference to the flex issue or the night shift differential, the Union perceives the Employer as urging the Arbitrator "to go beyond the written

document itself to reach a conclusion consistent with the Employer's untenable position" (E. Exs. #9, #10).

Finally, the Union relies on a 15-year past practice to resolve any ambiguities the Arbitrator may discern. Given the fact that the Employer, after the finalization of the 2002 MOA, "continued to adhere to a practice and interpretation that had been followed for more than fifteen (15) years, and there exists no clear and unambiguous language to change the practice," the Union contends that the Arbitrator "must be guided not only by the clear language of the prior MOAs, but the past practice of the parties over a period of many years."


## EMPLOYER POSITION

The Employer alludes to the Flex Units portion of the Level 3 bargaining session, particularly the "implement no later than June 15, 2002" language, as evidence that the parties during Interest-Based negotiations agreed "that the flex schedules to be implemented in the three identified nursing units of the Kings Highway division were going to follow the Petrie Model/hours of work in which night differential is not paid for the day shift."

Referring to a document entitled Twelve Hour Shift Guidelines for Registered Nurses about which Carmen Suardy testified that a copy was given to the Union during negotiations, the Employer notes that Paragraph 3(f) indicates "that shift differential is not paid unless the Registered Nurse's shift ends after 7 p.m." (E. Ex. #8).

Although the Employer acknowledges that the summary of agreements reached during the Level 3 bargaining "does not specifically refer to the Petrie model or to how or if a night shift differential is to be paid...the Agreement gives sufficient data to indicate that the Petrie Model was selected and that the Kings Highway Model was rejected."

The Employer provided a comparative analysis of the Petrie and Kings Highway models as follows:

| Petrie | Kings Highway |
|---|---|
| 4 week schedule consists of Thirteen 11.5 hours shifts as follows: 34.5/ 34.5/ 34.5/46 hours per week Employee is paid for actual hours worked each week | 4 week schedule consists of Twelve 12 hour shifts as follows: 35 hours each week Employee works 36 hours but is paid for 37.5 hours each week which consists of 1. hours of holiday time per week. |
| Three 15 minutes paid breaks per shift | Three 15 fifteen minutes paid breaks per shift |
| One unpaid meal break | One paid half-hour meal break |
| Hours of work are: 7am to 7pm or 7pm to 7am | Same |
| No night shift differential is paid to the 7 am to 7 pm shift | 4 hours night shift differential is paid to the 7 am to 7 pm shift for the hours 3 pm to 7 pm |
| 11.5 hours of night shift differential paid to the 7 pm to 7 am shift | 12 hours night shift differential paid to 7 pm to 7 am shift |
| Registered Nurses are scheduled for every other weekend off | Registered Nurses are scheduled for every third weekend off |

12

According to the testimony of Dallas Piana and Carmen Suardy, the Kings Highway model was rejected because of its "cost, wasteful aspects (pay for a lot of time that is not worked) and other inefficiencies fully known to the parties at the time due to an arbitration decision issued in June 2001." Moreover, the Employer asserts that the Kings Highway model was "inconsistent with the mutually identified interests of the parties to be mindful of the fiscal limitations of the parties."

The Petrie (flex) model at Kings Highway Hospital was implemented "in every respect" except that nurses are scheduled to be off every third weekend (as opposed to the Petrie Model of every other weekend off) "if the staffing unit permits it and if the Medical Center does not incur additional costs..." (U. Ex. #6).

In the Employer's view, the Kings Highway Nursing representatives manifested their displeasure with the implementation of the Petrie Model by not signing the agreement (E. Ex. #9, U. Ex. #4). Maureen Woodroffe purportedly testified that she refused to sign the Level 3 and Level 4 Agreements because she learned that the Petrie model would supplant the existing flex schedule at Kings Highway.

Contrary to the contentions of the Union, the Employer argues that "the Agreement is far from clear on the issue of night shift differential – there is no mention of it at all"; therefore, the testimony of Suardy and Piana clarifies the parties' intention regarding this issue.

The Employer deems the 1991-1992 Agreement marginally applicable to the instant case because it was entered into by Local 1199 and when Kings

13

Highway Hospital prior to the 1994 merger with Beth Israel and only the ICU, CCU and ED were on flex schedules. As the Employer notes, "since 1994, Beth Israel Medical Center has negotiated its own agreements with 1199 and chosen not to expand the old flex agreements into the Kings Highway Hospital."

The Employer further discounts the erroneous payment of night shift differential on the day shift (7:00 a.m. to 7:00 p.m.) from October 2002 to August 2005 since the payments were stopped once Ms. Piana discovered the error.

Finally, the Employer concludes that "it is also inconsistent with the Interest-Based problem solving process to argue that the parties agreed to a flex 'model' but that the elements of the 'model' were not fully discussed and/or 'heard' by those who participated in the discussions."

## DISCUSSION

It is a well-established principle of arbitral law that the Arbitrator in interpreting contract language begins with the premise that his authority is derived from the parties' collective bargaining agreement, which the parties have empowered him to interpret without adding to, detracting from, or modifying in any way the terms and provisions of their agreement. If the express language is plain and unambiguous, the Arbitrator must give effect to that language, otherwise he would deviate not only from one of the cardinal principles of arbitration, which is the parties to a contract have the right to stand on its precise terms, but he would also exceed his jurisdiction as defined and limited by the parties' collective bargaining agreement.

14

It is also a basic and fundamental concept in the arbitration process that an arbitrator's function in interpreting and applying contact language is to first ascertain and then enforce the intention of the parties as reflected by the language of the pertinent provisions involved. A necessary and essential corollary is the principle that, if the language being construed is clear and unambiguous, such language is in itself the best evidence of the intention of the parties, obviating resort to past practice, bargaining history, or other extrinsic evidence.

With respect to the instant case, it is undisputed that prior to Beth Israel's 1994 acquisition of the Kings Highway Hospital, the Registered Nurses at that hospital, who worked the 12 hour flex shifts and were assigned to the Critical Care Unit, Intensive Care Unit and the Emergency Department, had, as the result of several MOAs negotiated by Local 1199 and Kings Highway Hospital, night shift differential beginning at 3:00 p.m.

The contractual history prior to the merger of Beth Israel Medical Center and Kings Highway Hospital is clear. Beginning with a 1988 MOA, which provided that the 12 hour flex shifts would run from 7:00 a.m. to 7:00 p.m. and 7:00 p.m. to 7:00 a.m. and the night differential would begin at 7:00 p.m., and continuing with a 1989 MOA, which provided that the 10% night shift differential would also be paid for the hours between 3:00 p.m. and 7:00 p.m., nurses at Kings Highway Hospital received this benefit. Thereafter, Section 8 of the 1991 MOA changed the method of paying the night shift differential to a "pro-rata basis for those hours." Other than this adjustment in the method of calculation, the

record establishes that the nurses who worked a 12 hour flex shift and who were assigned to the CCU, ICU and ED received the night shift differential for an uninterrupted period of six years (1988-1994).

Moreover, following the 1994 merger of Beth Israel and Kings Highway Hospital, no changes were made in the flex schedule or the pro-rata night differential as per the 1991 MOA for hours worked between 3:00 p.m. and 7:00 p.m. Thus, the payment of night shift differential for these hours continued unabated until October 2002.

The crux of the instant case is whether the parties in the course of their negotiations for a successor agreement to the expiring 2001 MOA amended the pre-existing night shift differential at Kings Highway Hospital. In order to facilitate agreement on various outstanding issues, the parties participated in an Interest-Based problem solving process designed to achieve consensus solutions to the problems as distinguished from traditional adversarial negotiations. Level 3 or local bargaining was devoted to issues affecting a specific institution. It was after these local bargaining sessions conducted on June 13th, August 7th and August 8, 2001 that the parties differ in their assessment of what transpired. The Interest-Based negotiations culminated in the 2002 Agreement, dated February 21, 2002 (U. Ex. #4).

On the one hand, the Union, which has the burden of proof in a contract interpretation grievance, maintains that, although one of the issues addressed in the 2002 Agreement is entitled "Flex Units," only two changes were made in the Kings Highway Division flex schedule, neither of which impacted the payment of

night shift differential. Other than changing the previous Kings Highway flex schedule of three (3) 12 hour shifts with a make-up shift every 6 weeks to a schedule providing for thirteen (13) 11.5 hour shifts and changing the 30 minute paid lunch to a 30 minute unpaid lunch to accommodate the Adelman Award, the Union contends "[t]here was no mention of changing the Kings Highway language that provided for the payment of a differential for hours that fell between 3:00 p.m. and 7:00 p.m. as set forth in the 1989 MOA (U.2) and the 1991 MOA (U.3)."

On the other hand, the Employer has maintained that the parties during the Interest-Based negotiations, as evidenced by the notes taken by the facilitator, adopted the Petrie Model of flex – a model which was operable in the Petrie Division of Beth Israel prior to the 1994 merger – for implementation in the Kings Highway Division effective June 15, 2002.

Whereas the Kings Highway flex schedule provided for night shift differential from 3:00 p.m. to 7:00 p.m., the Petrie Division flex schedule before and after the merger stated:

> "All Nurses working twelve hour shift arrangements whose regular hours end after 7 p.m. shall receive pro-rata shift differential from the beginning of the regular shift" (E. Ex. #11).

There were additional differences between the Petrie Model and the Kings Highway Model, namely the Petrie Division's flex schedule provided for thirteen (13) 11.5 hour shifts, inclusive of a thirty (30) minute unpaid lunch and every other weekend off, while the Kings Highway flex schedule, prior to the 2002

MOA, provided for three (3) 12 hour shifts, inclusive of a thirty (30) minute paid lunch and every third weekend off.

Considering the evidence in its entirety, the Arbitrator is persuaded that the Employer violated the collective bargaining agreement when it ceased to pay night differential to Registered Nurses at the Kings Highway Division who worked the 7:00 a.m. to 7:00 p.m. flex schedule.

The Arbitrator finds that the express contract language is clear and unambiguous regarding the entitlement of nurses, who worked the 12 hour flex schedule at the Kings Highway Division/Hospital from 7:00 a.m. to 7:00 p.m., to night shift differential for the 3:00 p.m. to 7:00 p.m. period. The night shift differential benefit had been clearly set forth in MOAs negotiated between Local 1199 and Kings Highway Hospital since 1989 and assumed by Beth Israel upon its merger with Kings Highway Hospital in 1994.

Where the agreement is unambiguous, the Arbitrator is barred from going behind the Agreement to consider parol or other evidence as to the intent of the parties. Contract language is unambiguous when it has a definite and precise meaning unattended by the likelihood of a misconception or a reasonable alternative interpretation that is based on the language of the agreement. The rule is basic in contract law. It simply recognizes that where competent parties have assented to a writing as the expression of that which they have agreed to, the terms of the writing are conclusive, irrespective of whether that meaning is different from that either party proposes that it have.

18

Assuming arguendo, as the Employer argues, that the night shift differential language is ambiguous because it is not specifically mentioned in the 2002 MOA, the Arbitrator, absent evidence that the parties mutually agreed to an oral modification of the language, or is controlled by a past practice, is compelled to resort to the express language on the subject. Although there is written evidence that the parties during Interest-Based negotiations agreed to modify certain aspects of the Kings Highway Division model by adding 2 North, SSU and 3 East and by conforming the Kings Highway flex schedule to the Petrie Model to some extent by changing the shifts to thirteen 11.5 hour shifts, inclusive of 30 minutes unpaid lunch, the fact that night shift differential is omitted from the 2002 Agreement is compelling evidence, in the Arbitrator's opinion, that there was no meeting of the minds on this issue.

Given the consensus oriented format utilized by the parties during the 2001-2002 Interest-Based negotiations and the "solutions" generated by the process, the omission of night shift differential under the flex units operates to retain the status quo insofar as the Kings Highway Division nurses were concerned.

Undoubtedly, Registered Nurses from every division of Beth Israel participated in the Interest-Based negotiations as well as executives from Local 1199 and BIMC, however, such participation and exchange of proposals regarding the Petrie Model and the Kings Highway Model is not tantamount to a binding agreement that the night shift differential provided for the Kings Highway nurses in ICU, CCU and ED since 1989 would be changed in conformance with

the Petrie Model. Unlike the Employer, the Arbitrator finds that a statement in bargaining that one of the parties understands the position of the other party, without more, is simply not equivalent to agreement to that position.

Although the Employer may have assumed that the extension of the 12 hour flex schedules to nursing units 2 North, 3 East and SSU necessarily entailed adoption of the Petrie Unit language on night shift differential, the dearth of actual language in the 2002 MOA to this effect or unequivocal extrinsic evidence evincing the same purpose makes this expectation unreasonable and leaves intact the night shift differential language contained in the 1989 and 1991 MOAs.

In addition, the Arbitrator is reluctant to infer that the signature of Ms. O'Brien on the Level 4 MOA followed by a cross-out of her signature is evidence that she objected to the parties' adoption of the Petrie Model. Not only is there no mention of the Petrie Model in the Level 4 MOA, O'Brien testified that she had no knowledge of the Petrie Model and was more concerned about working 13 shifts in a 4-week period. That the Level 4 MOA was subsequently signed by Local 1199 Vice President Norma Amsterdam on June 4, 2002 has no bearing on the parties' Level 3 negotiation regarding the Petrie Model (E. Exs. #9, #10).

However, it is noteworthy that Maureen Woodroffe, a member of the contract negotiation committee, testified that she did not sign the Level 4 MOA and crossed off her name because she was "flabbergasted" when she was told the flex provision would be based on the Petrie Model (E. Ex. #9).

The Arbitrator is disinclined to draw a negative inference from the failure of the Employer to call Amsterdam as a witness since the Union had the burden of

proof. The missing witness inference is appropriate when the charging party fails to call a witness available to that party and who would be expected to provide favorable testimony.

Finally, the Arbitrator finds that the Employer's payment of night shift differential to nurses on all flex units from October 2002 to August 2005 is now moot since those payments were properly made based on the Arbitrator's findings <u>supra</u>.

As a remedy, the Employer is ordered to pay the pro-rata portion of the contractual shift differential to the Registered Nurses employed at the Kings Highway Division assigned to the 12 hour 7:00 a.m. to 7:00 p.m. flex schedule retroactive to August 7, 2005.

21

NOW THEREFORE, as the duly selected Arbitrator, having heard the evidence presented, I issue the following:

### AWARD

1) The Employer violated the collective bargaining agreement when it ceased to pay night shift differential to Registered Nurses at the Kings Highway Division who worked the 7:00 a.m. to 7:00 p.m. flex schedule.

2) As a remedy, the Employer is ordered to pay the pro-rata portion of the contractual shift differential to the Registered Nurses employed at the Kings Highway Division assigned to the 12 hour 7:00 a.m. to 7:00 p.m. flex schedule retroactive to August 7, 2005.

3) The Arbitrator shall retain jurisdiction sine die to address any problems that may arise in the implementation of this award.


_____
Robert T. Simmelkjaer
**ARBITRATOR**


STATE OF NEW YORK}
COUNTY OF NEW YORK} SS:


I hereby affirm upon my oath as Arbitrator that I am the person described herein who executed this instrument, which is my award.


_____
March 6, 2007                          Robert T. Simmelkjaer