Barry J. Peek (BJP 3268)
Jordan Rossen (JR 6176)
MEYER, SUOZZI, ENGLISH & KLEIN, P.C.
1350 Broadway, Suite 501
New York, New York  10018
212-239-4999

Attorneys for the Defendant

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
BETH ISRAEL MEDICAL CENTER,

                         Plaintiff,                07 CIV 6254 (MGC)
                                                   ECF Case

              v.

1199/S.E.I.U. UNITED HEALTHCARE WORKERS
EAST D/B/A LOCAL 1199/S.E.I.U. NATIONAL
HEALTH AND HUMAN SERVICE EMPLOYEES
UNION

                         Defendant.
-----------------------------------------------------------------X

## AFFIRMATION OF BARRY J. PEEK IN SUPPORT OF DEFENDANT-COUNTER CLAIM PLAINTIFF'S RULE 12(c) MOTION CONFIRMING ARBITRATION AWARD

Barry J. Peek states as follows:

1.      I am a partner in the law firm or Meyer, Suozzi, English &

Klein, P.C.  I submit this Affirmation in support of the Motion for

Confirmation of the March 6, 2007 Arbitration Award of Arbitrator Robert

T. Simmelkjaer.  The Rule 12(c) Motion for Confirmation is based upon the

pleadings, exhibits to the pleadings and references in the pleadings or exhibits.

2.    I represented the Union before the arbitrator in the instant dispute as well as in the lunch pay dispute decided by Arbitrator Richard Adelman. Attached are the post hearing briefs of Local 1199 and BIMC in the current dispute: Local 1199 Memorandum of Law (Union Exhibit B in the instant case); BIMC January 11, 2007 Brief (Union Exhibit C); BIMC January 26, 2007 Reply Brief (Union Exhibit D) and Local 1199's January 30, 2007 Reply Brief (Union Exhibit E).

3.    Attached also is the June 21, 2001 Opinion and Award of Arbitrator Richard Adelman (Union Exhibit F), which was Employer Exhibit 5 at the Arbitration.

4.    Arbitrator Simmelkjaer's Opinion and Award (Petition Exh. 8) is based on contracts including those attached to the Petition; it refers to the post-hearing briefs, reply briefs and arguments (at p. 2) and refers to the Adelman Award (para. 10, at pp. 5, 6; and at pp. 9, 16-18).

_____/s/_____
Barry J. Peek (BJP 3268)

August 30, 2007

88384

# UNION EXHIBIT B

AMERICAN ARBITRATION ASSOCIATION
ARBITRATOR: ROBERT T. SIMMELKJAER
-----------------------------------------------------------------X
In the Matter of the Arbitration between

LOCAL 1199,

UNION

American Arbitration Association
  Case No. 13 300 02379 05

-against-

BETH ISRAEL MEDICAL CENTER,

EMPLOYER

-----------------------------------------------------------------X

MEMORANDUM OF LAW
ON BEHALF OF LOCAL 1199

PRELIMINARY STATEMENT

Local 1199 National Health & Human Service Employees Union, SEIU (hereinafter referred to as "Local 1199" or "Union") is the duly certified bargaining representative for a unit of Registered Nurses employed at Beth Israel Medical Center (hereinafter referred to as the "Employer" or "Beth Israel"). Local 1199 represents the nurses employed by Beth Israel in the Petrie Division, the Singer Division and the Kings Highway Division.

On or about September 7, 2005, a dispute arose between Local 1199 and Beth Israel regarding the alleged failure of the Employer to pay a contractual differential to nurses assigned to the twelve (12) hour "flex" shift at the Kings Highway Division. A class action grievance was filed by Local 1199 in accordance with the parties' collective bargaining agreement and the matter proceeded to arbitration.

Robert T. Simmelkjaer was appointed by the American Arbitration Association to serve as the arbitrator in this matter and to render a final and binding decision. Hearings were held before the Arbitrator on March 15. 2006 and December 13, 2006. This Memorandum of Law is submitted on behalf of Local 1199 as its closing argument and in support of its position that the Employer violated the

1

collective bargaining agreement by not paying the proper amount of night shift differential to Registered Nurses who worked the flex shift at the Kings Highway Division.

## FACTS

Since in or about 1980 Local 1199 has been the exclusive bargaining representative for nurses employed at Kings Highway Hospital. In 1988 Local 1199 and Kings Highway Hospital entered into an agreement ("1988 MOA") which created twelve (12) hour shifts, (commonly known as "flex time") for Registered Nurses assigned to the Critical Care Unit ("CCU") and the Intensive Care Unit (ICU).[1] The introduction of the flex schedule for these units at Kings Highway Hospital was first implemented as a six (6) month pilot program. If the program was successful, after six (6) months the flex shifts were considered permanent. (U.1)[2]

The 1988 MOA stated in pertinent part as follows:

(1)…12 hour shifts will be considered the permanent staffing pattern for the units involved <u>unless changed by further contractual agreement.</u>
(2) The work week will consist of three 12 hour tours of duty……
(3) Shifts will be 7:00A.M. to 7:00 P.M. and 7:00 P.M. to 7:00A.M. <u>Night differential will start at 7:00 P.M.</u>

(Emphasis added).

On December 22, 1989, Local 1199 agreed to extend the collective bargaining that was due to expire on October 31, 1989. In accordance with a Memorandum of Agreement entered into on that date, the contract was extended until October 31, 1991. ("1989 MOA"). (U.2) In addition to extending the dates of the contract, the 1989 MOA modified certain contractual provisions, including the flex time provision.

Section 8 of the 1989 MOA stated in part as follows:

---

[1] Prior to 1994 Kings Highway Hospital was not affiliated with Beth Israel and was a separate employer. In addition, flex hours were later extended to include the emergency room.

[2] U. refers to Union Exhibits. E. refers to Employer Exhibits.

> 8. Those Registered Nurses who work a 12 hour shift (flex time)which includes the hours of 3:00 P.M. to 7:00 P.M. shall be paid the above 10% shift differential for those hours worked between 3:00 P.M. and 7:00 P.M.

The 1989 MOA modified the 1988 MOA by specifically providing for the payment of a shift differential for flex hours worked before 7:00 p.m. The later agreement provided for the payment of the shift differential for flex hours worked between the hours of 3:00 p.m. and 7:00 p.m. This particular provision was never changed, and, as a result, from 1989 until 2005, the Registered Nurses working the 12 hour flex schedule at Kings Highway Hospital received a night shift differential for hours worked between 3:00 p.m. and 7:00 p.m.

Thereafter, on November 10, 1991, Local 1199 and Kings Highway Hospital entered into a written Memorandum of Agreement ("1991 MOA") which extended and modified the prior contract until October 31, 1992. (U.3). Among other things, the 1991 MOA made specific reference to the flex shifts and the payment of the differential. The 1991 MOA confirmed the prior agreement which provided for night shift differential during the hours of 3:00 p.m. to 7:00 p.m.

Section 8 of the 1991 MOA stated as follows:

> 8. Those Registered Nurses who work a 12 hour shift (flex time) which includes the hours 3:00 P.M. to 7:00 P.M. shall be paid shift differential on a pro-rata basis for those hours.

Section 8 of the 1991 MOA merely changed the manner in which the shift differential would be calculated. It did not change the threshold requirements for receiving it.

In or about 1994 Kings Highway Hospital was merged with Beth Israel Medical Center and became a division of Beth Israel. No changes were made in the flex schedule arrangement that existed at Kings Highway Hospital since the time the flex schedule was first agreed to in 1988. There is no dispute that during the period 1994 until 2005, the Registered Nurses assigned to the 12 hour flex shift in the covered units received a shift differential, even if the nurse was assigned to the 7:00 A.M. to 7:00 P.M. shift. Those nurses continued to receive a pro-rata differential as per the 1991 MOA for hours worked between 3:00 p.m. and 7:00 p.m.

3

At the time of the 1994 merger and continuing thereafter, Beth Israel was comprised of the Petrie Division, the Singer Division and the Kings Highway Division. The Petrie Division, which had been part of Beth Israel prior to the merger, also instituted 12 hour flex shifts in 1988. The language governing the shift differential at Petrie, which is clearly different from the language governing Kings Highway Hospital both before and after the merger, stated as follows:

> "All Nurses working twelve hour shift arrangements whose regular hours end after 7 p.m. shall receive pro-rata shift differential from the beginning of the regular shift."

(Emphasis added). (See, E.11).

In addition, the Petrie Division's flex schedule provided for 13, 11.5 hour shifts, inclusive of a thirty (30) minute unpaid lunch. Contrary to what occurred at the Kings Highway Division in the 1989 and 1991 MOA's, the Petrie language has remained unchanged.

The Kings Highway Division flex schedule was slightly different than the Petrie schedule. That schedule originally provided for 3, 12 hour shifts, inclusive of a thirty (30) minute paid lunch. At Kings Highway, every sixth (6th) week a paid holiday would be earned but not taken to make up for a shortfall in hours worked per week.

The other major difference concerning the flex time schedule in Petrie and Kings Highway was the fact the nurses in the Kings Highway Division were entitled to receive the differential even if the shift did not end after 7 P.M. as was the case in Petrie. The reason for that is simple, the contract covering the Petrie Division did not contain a clause similar to the one contained in both the 1989 MOA and 1991 MOA between 1199 and Kings Highway Hospital which specifically provided for the payment of a pro-rata shift differential for flex hours worked during 3:00 P.M. to 7:00 P.M.

The other difference between the flex shift schedules at the Kings Highway Division and the Petrie Division is that the nurses in Kings Highway were scheduled to work every third weekend, whereas nurses at Petrie were scheduled to work every other weekend.

Since Beth Israel was a member of the League of Voluntary Hospitals and Homes of New York ("the League") the economic terms of the Kings Highway Hospital contract with Local 1199

were negotiated in what is referred to as the Master Agreement between the League and Local 1199. Other issues were negotiated separately.

This was the practice until 2001 when Local 1199 and the League entered into a Memorandum of Agreement ("2001 MOA") which set forth the procedure for negotiating a new collective bargaining agreement. (E.1). The agreement with the League, including those covering the Registered Nurses was due to expire on October 31, 2001.

The 2001 MOA established a process called "called interest based" negotiations. In order to complete both the Registered Nurse Negotiations, as well as the Industry Negotiations, the negotiating structure in 2001 took place at three (3) different levels. Level 1 was the Industry Negotiations. Level 2 was a multi-employer Registered Nurses only bargaining to deal with all issues affecting nurses. The last bargaining level was Level 3 which dealt with such issues as overtime and related issues. In addition local issues affecting a specific institution could be resolved at the Level 3 bargaining table. (See, E.1).

The issue of scheduling Registered Nurses working at the three (3) Beth Israel Divisions, Singer, Petrie and Kings Highway was of a mutual interest of the parties to the 2001 MOA as set forth in the list of Level 3 Interests. (E.3). This is also reflected in the bargaining notes prepared by one of the facilitators who attended the Level 3 bargaining session on June 13, 2001. (U.4).

During the time when the Level 3 bargaining was taken place, the flex program was before another arbitrator, Richard Adelman. As explained above, the Kings Highway flex schedule consisted of 12 hour shifts that included a paid lunch. This differed from the Petrie flex schedule in which the nurses were not paid for their lunch.

On June 8, 2000, the Employer, as it did here, unilaterally decided to change the manner in which it would apply the Kings Highway flex schedule by not paying the nurses for their lunch time. The Union alleged that the Employer's action would violate the prior agreements and brought the issue before Arbitrator Adelman for a resolution.

On June 21, 2001, Arbitrator Adelman issued his Opinion and Award. (E.5). Arbitrator Adelman sustained Local 1199's position and held that it was proper for the Employer to pay the Kings Highway

Registered Nurses who worked a flex schedule in accordance with the 1998 MOA for their meal breaks. In addition, the Employer was ordered to continue to pay the nurses for meal breaks. (See, E.5, page 7).

Subsequent to the Adelman Award, the parties continued the Level 3 bargaining process. Discussions were held on August 7 and 8, 2001, during which there was a great deal of discussion on the flex time options. The notes taken of those sessions reflects the fact that the major issue discussed concerning the flex schedule was the expansion of the program to other units. These notes, however, are devoid of any mention of changing the Kings Highway flex agreement and adopting the so-called Petrie model as it relates to the actual payment of the differential. (See, E.7).

The Interest Based Bargaining Process resulted in various solutions to some of the previously identified problems. This resulted in a formal document dated February 21, 2002. ("2002 Agreement"). (U. ). One of the issues dealt with in the 2002 agreement is entitled "Flex Units". (U.4, page 5).

As far as the Kings Highway Division flex schedule is concerned, the 2002 Agreement made only two (2) changes, both of which dealt with the schedule itself, and not with the payment of any differentials. The parties agreed that the nurses assigned to the flex units would be scheduled for 13, 11.5 hour shifts. That is a change from the previous schedule of 3, 12 hour shifts each week with a make-up shift every 6 weeks. In addition, the parties agreed to resolve the dispute that lead to the Adelman Award. There was a specific agreement that the Kings Highway flex schedule would include 30 minutes of an unpaid lunch. (See, U. page 5). There was no mention of changing the Kings Highway language that provided for the payment of a differential for hours that fell between 3:00 P.M. and 7:00 P.M. as set forth in the 1989 MOA (U.2) and the 1991 MOA (U.3)

Even after the 2002 Agreement was finalized, the nurses working at the Kings Highway Division continued to receive the differential when working the flex shift, even when the shift ended before 7:00 P.M. This situation continued for approximately three (3) years.

As stated in an Employer memorandum dated August 1, 2005, the Employer believed that during the Interest Based Negotiations, the Kings Highway Division not only agreed to adopt the same flex schedule as the nurses in the Petrie Division, they agreed to change the qualification for payment of the

6

corresponding differential. As a result, effective August 7, 2005, the Employer discontinued the long standing practice of paying nurses assigned to the flex units at Kings Highway Hospital who work the 7:00 a.m. to 7:00 p.m. shift the contractually mandated differential. In response thereto, Local 1199 filed a grievance and a subsequent Demand for Arbitration.

## ISSUE

Did the Employer violate the collective bargaining agreement when it ceased payment of the shift differential to Registered Nurses employed at the Kings Highway Division who work the 7:00 A.M. to 7:00 P.M. flex schedule and, if so, what shall be the remedy?

## ARGUMENT

### POINT I

THE EMPLOYER HAS VIOLATED THE COLLECTIVE BARGAINING AGREEMENT BY FAILING TO PAY THE SHIFT DIFFERENTIAL TO REGISTERED NURSES AT THE KINGS HIGHWAY DIVISION ASSIGNED TO WORK A 12 HOUR FLEX SHIFT, 7:00 A.M. TO 7:00 P.M.

A. The contract language before the Arbitrator is clear and unambiguous.

It is undisputed that for a period of more than fifteen (15) years, the Registered Nurses working a 12 hour flex shift at Kings Highway Hospital received some sort of shift differential even if they worked the 7:00 A.M. to 7:00 P.M. shift. This benefit is clearly set forth in the various collective bargaining agreements and subsequent Memorandum of Agreements entered into between Local 1199 and Kings Highway Hospital. (See, U.1, 2 and 3).

Notwithstanding this well established practice, and the clear language of the contracts, the Employer, effective August 7, 2005, refused to pay the shift differential for those Kings Highway Registered Nurses assigned to the 7:00 A.M. to 7:00 P.M. flex shift. The Employer has taken this action in direct violation of the language contained in the collective bargaining agreements with Local 1199.

The history surrounding the implementation of the 12 hour flex schedule at Kings Highway Hospital is certainly worth repeating. Prior to 1994, Kings Highway Hospital was not affiliated with Beth Israel Medical Center. However, Kings Highway Hospital did have a collective bargaining relationship with Local 1199.

In accordance with a written agreement between Local 1199 and Kings Highway Hospital, in 1988 a six (6) month Pilot Program was implemented to review the feasibility of certain Registered Nurses working a 12 hour shift, commonly known as a "flex shift". The shifts were set as 7:00 A.M. to 7:00 P.M. and 7:00 P.M. to 7:00 A.M. and a night shift differential would be paid for hours worked after 7:00 P.M. The work week would consisted of 3, 12 hour tours of duty, inclusive of a paid lunch. Therefore, a Registered Nurse assigned to such a schedule would have worked a 36 hour work week, resulting in one (1) extra shift every six (6) weeks.

The terms of this Pilot Program were stated in the clear and unambiguous language of the 1988 MOA (U. 1). In addition, the parties to the 1988 MOA specifically stated that if the parties agreed to extend the program beyond the initial six (6) Pilot Program, the 12 hour shifts would be considered the permanent staffing pattern for the units in question, "...unless changed by further contractual agreement." (See, U.1, paragraph 1). In accordance with this agreement the night shift differential would only be paid for hours worked after 7:00 P.M.

On December 22, 1989, Local 1199 and Kings Highway Hospital entered into a subsequent agreement which, among other things, changed the criteria for a Registered Nurse working the 12 hour flex schedule to be eligible for the shift differential. Paragraph 8 of the 1989 MOA stated as follows:

> "Those Registered Nurses who work a 12 hour shift (flex time) which includes the hours of 3:00 P.M. to 7:00 P.M. shall be paid the above 10% <u>shift differential for those hours worked between 3:00 P.M. and 7:00 P.M.</u>"

(Emphasis added).

This changed the previous agreement which provided for the payment of the shift differential only after 7:00 P.M. (See, U.1, paragraph 3).

The only other reference to the payment of the shift differential is reflected in the 1991 MOA between Local 1199 and Kings Highway Hospital. (U.3). That agreement reiterated the prior agreement that a shift differential would be paid to Registered Nurses who worked a 12 hour shift (flex), including the hours of 3:00 P.M. to 7:00 P.M. The specific modification was in the way the pro-rata differential was calculated.

Since the Employer failed to produce any language to the contrary, the Arbitrator is left with only the clear and unambiguous language of the 1988, 1989 and 1991 MOA's. It is a well established principle of law that when a contract is clear and unambiguous on its face parol evidence is not to be accepted to contradict that language. Domtar Industries, Inc. and PACE, Local 5-1329, 120 LA (BNA) 801, 807 (FMCS Case No. 04/00955) (McReyonlds, 2004).

The bargaining history offered by the Employer that lead to the execution of the 2002 MOA should not even be considered by the Arbitrator. Such evidence is precluded by the parol evidence rule, which provides that evidence of oral statements, or even oral agreements, may not modify the unambiguous terms of a written agreement. As stated by Elkouri and Elkouri:

> Under the parol evidence rule a written agreement may not be changed or modified by any oral statements or arguments made by the parties in connection with the negotiation of the agreement. A written contract consummating previous oral and written negotiations is deemed, under the rule, to embrace the entire agreement, and, if the writing is clear and unambiguous, parol evidence will not be allowed to vary the contract. This is said to a rule of substantive law which when applicable defines the limits of a contract.

Elkouri & Elkouri, How Arbitration Works   (6th ed. 2003) (footnotes omitted).

Based on the language contained in the relevant MOA's, the Registered Nurses who worked the 7:00 A.M. to 7:00 P.M. flex shift at the Kings Highway were and continued to be entitled to a pro-rata portion of the shift differential. The Employer's attempt to clutter the record with its constant reference to the Interest Based Negotiations that took place in 2001 is completely misplaced and should be dismissed by the Arbitrator as nothing more than self serving and in direct violation of the parol evidence rule.

B.      The 2002 Agreement did not change the Employer's obligation to pay the shift differential to Registered Nurses at Kings Highway Hospital who work the 7:00 A.M. to 7:00 P.M. 12 hour flex shift.

Even if the Arbitrator should rule that the language in question is ambiguous, the parol evidence offered by the Employer does not change the result. The Employer's position that Local 1199 agreed to alter the payment of the shift differential for the Registered Nurses working the flex shift at its Kings Highway Division is totally without merit. The Employer argues that the 2002 Agreement represents an agreement that the flex schedules and payments for working those shifts in both the Kings Highway Division and the Petrie Division would be exactly the same. For the Arbitrator to accept the Employer's argument, he would have to ignore over 15 years of contractual language to the contrary, as well as a 15 year practice. Most importantly, the practice of paying the nurses at Kings Highway the shift differential continued even after the 2002 Agreement supposedly changed the method of payment. These are facts that, in this instance, are clearly dispositive and cannot be ignored.

Prior to 1994, when it merged with the Beth Israel Medical Center, Kings Highway Hospital was a stand alone institution. At that time, the Petrie Division, which was a Beth Israel Division, implemented a 12 hour flex schedule. This schedule also went into effect in 1988 and the contract governing Petrie provided for a shift differential only for nurses whose regular hours "end after 7 P.M." (E.11). Contrary to Kings Highway, the Petrie language did not change.

The flex schedule itself at Petrie was slightly different because it was inclusive of an unpaid thirty (30) minute lunch break. As a result, the Registered Nurses at Petrie worked 13, 11.5 hour shifts in a 4 week period as compared to the Kings Highway Nurses who worked 3, 12 hour shifts per week, inclusive of a thirty (30) minute paid lunch.

Since the contract language governing the Kings Highway flex nurses was clearly different, the Kings Highway nurses working the 7:00 A.M. to 7:00 P.M. flex shift were paid a pro-rata portion of the shift differential set forth in the contract. (See, U.2 and 3). In fact, the nurses at Kings Highway working

that particular flex shift, continued to receive the differential for more than three (3) years after the 2002 Agreement was finalized.

In 2001 Local 1199 and the League of Voluntary Hospital and Homes agreed to "Interest Based Bargaining". This was an attempt at a process to reach an agreement with the Registered Nurses at the same time Local 1199 and the League agreed to a contract with other employees in the industry. According to the formal agreement reached in 2001 (E.1) these negotiations were going to take place on three (3) different levels. Level 1 was the "Industry Negotiations." Levels 2 and 3 would deal with specific issues and concerns involving the Registered Nurses. These issues were considered local issues and included the flex time schedule. (See, E.3 and 4).

The notes of the Interest Based Bargaining session submitted by the Employer offers the best evidence of what was discussed in regard to the flex schedules in question here. In particular, the notes of the August 7 and 8, 2001 bargaining sessions reflects that the main concern was the expansion of the flex time program, not the differences in the payment of the shift differential. (E.7). In fact, in none of the notes offered by the Employer, or in any agreements reached as the result of the Interest Based Bargaining, is there any reference whatsoever to the payment of the shift differential.

Ultimately, as reflected in the 2002 MOA the parties did agree to modify the structure of flex schedule at the Kings Highway Division. (U.4). Based on a previous Arbitration Award issued by Richard Adelman in June 2001, the Employer knew that in order to change the flex schedule for the Kings Highway Division from a paid thirty (30) minute lunch to a non-paid thirty (30) minute lunch, it had to obtain a specific agreement from Local 1199 which would be reflected in clear and concise language. This was accomplished in the 2002 MOA where the parties agreed to change the flex schedule at the Kings Highway Division to include a thirty (30) minute unpaid lunch. (See, U.4 page 5). The 2002 MOA is completely silent on the issue that is before this Arbitrator, to wit; the alleged agreement to change the method in which the shift differential is to be paid.

11

Here there is no evidence to suggest that the parties use of the language in the 2002 MOA was intended to convey anything other than the use of such language as popularly understood. As stated in Elkouri, infra., at 448:

> Arbitrators give words their ordinary and popularly accepted meaning in the absence of a variant contract definition, or extrinsic evidence indicating that they were used in a different sense or that the parties intended some special colloquial meaning.

This is a clear example, notwithstanding the self-serving testimony of Carmen Suardy, that if the parties wanted to modify the payment of the shift differential as well as the flex schedule itself, they could have easily included such a clear intent in the eventual language of the agreement itself. However, it did not and a negative inference must be drawn against the Employer and its attempt to argue otherwise in this proceeding.[3]

A collective bargaining agreement is to be viewed as whole, not isolated parts. Doss Aviation, Inc and Teamsters Local 957, 107 LA (BNA) (Feree, 1966); Arlington heights Fire Department and Arlington Heights Firefighters Ass'n, Local 3105, 107 (BNA) 1010 (Goldstein, 1966).

Contrary to the Employer's position here, page 5 of U. 4 must be read in conjunction with the language set forth in the 1988, 1989 and 1991 MOA's (U.1, 2 and 3). As was correctly stated by Arbitrator Allen in Benton Harbor and Police Officers Labor Council, 104 LA (BNA) 621 (Allen, 1995):

> "…it is a basic rule of contract construction that an agreement must be construed in its entirety. A word, phrase or section of an agreement can be isolated from the rest of the agreement or given a meaning that is far from the remainder of the agreement…."

If the Arbitrator was to accept the Employer's argument and find that the parties agreed to change the method of paying the shift differential for the Kings Highway Registered Nurses working the 12 hour flex shift schedule, he would have to rewrite the language that presently governs that benefit. That is

---

[3] Ms. Suardy made numerous references to alleged conversations and understandings she had with Local 1199 Vice-President Norma Amsterdam. Despite the heavy reliance by the Employer on Ms. Amsterdam's alleged understandings, the Employer failed to call Ms. Amsterdam as a witness and failed to even explain that it made any attempt to contact her. Therefore, a negative inference must be taken against the Employer.

something this Arbitrator does not have the authority to do. <u>Adams- Columbia Electric Cooperative v.
IBEW, Local 965,</u> 117 Lab. Rep. (BNA) 1765 (2002) (Baron Arb.) (an arbitrator cannot rewrite the
contract). <u>See also, Bureau of Engraving, Inc. v. Graphic Comm. Int'l Local 1B,</u> 114 Lab. Arb. Rep.
(BNA) 598, 610 (2000) (Bard, Arb.) (holding that "...the Arbitrator is without authority to rewrite the
contract language to relive the Employer from the consequences of its own proposal....").

The Arbitrator must interpret the collective bargaining agreement as it is written. It is well
established that Arbitrators must accept the language of a contract "as they find it" and where it is clear,
give it its plain meaning. <u>Pennsylvania Power & Light Co.</u>, 86 LA 1151 (Light 1986). As Arbitrator
Light stated, "the function of an Arbitrator is not to impose his concept of what the language should be,
nor his concept of what the parties should have bargained." <u>Id.</u>

Since the parties did not modify the language of the 1988 MOA, the 1989 MOA and/or the 1991
MOA which specifically provides for the payment of the shift differential to Registered Nurses working
at the Kings Highway Division, and since the 2002 MOA is completely silent on the issue, the Arbitrator
must grant the grievance in all respects.

    C.    The fact that an 1199 representative refused to sign the Level 4
            <u>does not support the Employer's position in this case.</u>

The Employer offered into evidence a version of the Level 4 MOA where Patricia O'Brien's
signature is crossed out. (E.9). The Employer argued that the reason why Ms. O'Brien first signed and
then refused to sign the document was because Ms. O'Brien realized that the parties were agreeing to the
so-called "Petrie Model" in all aspects and that Ms. O'Brien objected to that. The document was later
signed by Norma Amsterdam on June 4, 2002. (E.10).

It is hard to imagine that by not signing the Level 4 MOA (E.9), an argument could be made that
1199 was objecting to an alleged agreement to adopt the Petrie Flex Model, including the method of
payment of the differential. In the first instance, the document (E.9), in question makes absolutely no
reference to the flex issue. Once the again, the Employer would like this Arbitrator to go beyond the

13

written document itself to reach a conclusion consistent with the Employer's untenable position. Such a result is not possible based on the record presented in this instance.

Moreover, as the union testified, the reason for the confusion in signing the Level MOA had nothing to do with the payment of the flex differential. It was based on the fact that the Kings Highway Nurses wanted to insure that the 12 hour flex schedule which was being modified by the 2002 MOA would still reflect the fact that they would be scheduled every third weekend. That issue resolved in a letter dated April 4, 2002 to Local 1199 whereby the Employer agreed that the flex nurses at the Kings Highway Division would be scheduled to work every third weekend. (U.6).

This argument by the Employer amounts to nothing more than another unsuccessful effort to obtain a change in the collective bargaining agreement when it wasn't able to do so through the negotiating process. Certainly that is not the purpose of arbitration and this Arbitrator should not allow it now.

### POINT II

THE ARBITRATOR CANNOT IGNORE THE WELL ESTABLISHED PAST PRACTICE OF THE PARTIES IN APPLYING THE COLLECTIVE BARGAINING AGREEMENT

If the Arbitrator should rule that the contract is ambiguous, he must be guided by a more than fifteen(15) year past practice. When interpreting a particular portion of a collective bargaining agreement which is deemed ambiguous, arbitrators quite often rely upon past practice and custom to establish its meaning.

> "…It is easy to understand why, the parties' intent is most often manifested in their actions. Accordingly, when faced with ambiguous language, most arbitrators rely exclusively on the parties' manifestation of intent as shown through past practice and custom. Indeed, use of past practice to give meaning to ambiguous contract language is so common that no citation of arbitral authority is necessary".

Elkouri & Elkouri, How Arbitration Works, at. 623 ( 6th ed. 2003). (footnotes omitted).

14

In the instant proceeding, even after the 2002 Agreement was finalized, in which, according to the Employer, this specific issue was dealt with, the Employer continued to adhere to a practice and interpretation that had been followed for more than fifteen (15) years. That is, the Registered Nurses working at the Kings Highway Division continued to receive the a pro-rata portion of the shift differential for working the 7:00 A.M. to 7:00 P.M. flex shift schedule.

As one arbitrator correctly stated:

> There would have to be very strong and compelling reasons for an arbitrator to change the practice by which a contract provision has been interpreted in a plant over a period of several years and several contracts. There would have to be a clear and unambiguous direction in the language used to effect such a change.

Webster Tobacco Co., 5 LA 164, 166 (Brandschain, 1946).

Since no such clear and unambiguous language to change the practice exists anywhere in the record in this proceeding, the Arbitrator must be guided by not only the clear language of the prior MOA's (U.1, 2 and 3), but the past practice of the parties over a period of many years.

## POINT III

THE EMPLOYER MUST PAY THE REGISTERED NURSES EMPLOYED AT THE KINGS HIGHWAY DIVISION ASSIGNED TO THE 12 HOUR 7:00 A.M. TO 7:00 P.M. FLEX SCHEDULE A PRO-RATA PORTION OF THE CONTRACTUAL SHIFT DIFFERENTIAL

Once the Arbitrator rules that the Employer has violated the collective bargaining agreement, the Employer must be ordered to pay the pro-rata portion of the contractual shift differential retroactive to August 7, 2005. That is the effective date upon which the Employer ceased making those payments. The Employer must also be ordered to continue to make these payments until there is a specific agreement with Local 1199 to do otherwise.

The Arbitrator should retain jurisdiction to conduct a formal back pay hearing should there be a dispute between the parties in effectuating the award.

## CONCLUSION

15

For all the reasons set forth above, the grievance filed by Local 1199 on behalf of the Registered Nurses employed by the Employer at its Kings Highway Division should be granted in all respects. Furthermore, the Arbitrator should retain jurisdiction to determine any disputes that may arise between the parties regarding the implementation of the Award, including, but not limited to, any back pay calculations.

Respectfully submitted,

BY:

BARRY I. PEEK
Meyer, Suozzi, English & Klein, P.C.
Attorneys for Local 1199
1350 Broadway, Suite 501
New York, New York 10018
(212)239-4999

16

# UNION EXHIBIT C

**BethIsrael**

Manhattan Campus for
the Albert Einstein College
of Medicine

**Labor Relations**
**Beth Israel Medical Center**
305 First Avenue
New York, NY 10003

WeHealNewYork.org

January 11, 2007

Robert T. Simmelkjaer
Arbitrator
c/o Mariana Tinizhanay
Case Manager
American Arbitration Association
1633 Broadway, 10th Floor
New York, NY 10019

Re:   Failure to pay night shift differential to Registered Nurses
      AAA Case No.: 13-300-02379-05

Dear Arbitrator Simmelkjaer:

Beth Israel Medical Center submits this post-arbitration brief in the above captioned
proceedings between Beth Israel Medical Center, Kings Highway Division ("BIMC" or
"the Employer"), and 1199 SEIU ("Union") collectively referred to as "the parties".

### Issue

The parties agreed that the issue before the arbitrator is:

Did the employer violate the collective bargaining agreement when it ceased to pay night
shift differential to RNs at the Kings Highway Division who work 7 a.m. - 7 p.m. flex on
2 North, SSU and 3 East? If so what shall be the remedy?

### Undisputed Facts

The Union is the representative of all the Registered Nurses employed by BIMC,
including those who are assigned to the Kings Highway division. In 2001, the parties
entered into an Agreement addressing certain terms and conditions of employment of the
nurses and modifying a previous Agreement. This Agreement, in evidence as Union
Exhibit 4, provides for the implementation of flex schedules in certain nursing units at

Continuum Health Partners, Inc.







1

each of the then three divisions of the Employer (Petrie, Singer[1] and Kings Highway). The Agreement reads:

**Flex Units**
**Implement no later than June 15, 2002**

**Petrie:**  8 Linsky, 8 Silver, 5 Dazian
**Singer:**  Neuro-11th Floor, Neuro, SD, Neuro ICU
        Peds-10th Floor, SD, ICU
**Kings Highway-2 North, SSU, 3 East (13, 11.5 hour shifts in 4 weeks model/12 hours inclusive of 30 minutes unpaid lunch)**
**Surgical Services - In the Operating Room, of the existing budgeted positions 3 will be converted to flex at Petrie (13, 11.5 hour shifts in 4 weeks model) and one each at Singer and KHD (10 hour shift)**

The first page of the Agreement, Union Exhibit 4, also states, that "Beth Israel and the RN Division of 1199, SEIU, used an Interest-Based Bargaining Process" to address an agreed upon issue statement that included among other things, the parties' interest in "maintaining a staffing system that meets the needs of the RN's" as well as maintaining "the quality of patient care given the scarcity of resources (e.g. personnel, fiscal limitations, etc.)."

Registered Nurses from every division of BIMC participated in the negotiations as well as Norma Amsterdam, Executive Director of the RN Division of 1199 and Carmen Suardy, Assistant Vice President of Labor and Employee Relations for Continuum Health Partners, the parent company of Beth Israel Medical Center.

Martin Tuite, Carol Gannon, Maureen Woodroffe, and Patricia O'Brien, are the four (4) Registered Nurses employed by the Kings Highway division of BIMC who participated in the negotiations.

In order to participate in the negotiations, the 1199/SEIU League RN Training & Job Security Fund provided all representatives with training in the Interest Based Problem solving process. The Interest Based Problem solving Process requires that the participants define the problem to be solved, the interests or needs and concerns of each party in solving the problem, and the options or possible solutions to the problem based on identified and agreed upon criteria.  Once these steps are taken, the parties choose, through consensus, the options that meet the criteria for the final solution in order to craft a comprehensive solution to the identified problem.

Union Exhibit 4 is the Agreement and list of "solutions" chosen by the parties for the agreed issue statement.  Under each item of the Agreement, except for the provision concerning the Flex units, the words "consensus on the following" appear.

---

[1] The Singer Division closed in August 2004.

2

## Argument

The Employer established through testimony and documentation that it was made clear to the Union, during the Interest-Based discussions on the issue of flex schedules, that the flex schedules to be implemented in the three identified nursing units of the Kings Highway division were going to follow the Petrie Model/hours of work in which night shift differential is not paid for the day shift.

Employer Exhibit 8 defines the Petrie Model of flex and it specifically states, at Paragraph 3 (f), that night shift differential is not paid unless the Registered Nurse's shift ends after 7 p.m. Carmen Suardy testified that this document was given to the Union during the discussions. This testimony was not refuted.

The interest-based bargaining sessions were overseen by a facilitator who not only monitored the process, but also summarized the agreements reached as reflected in Union Exhibit 4. This Agreement is the summary of notes taken by the facilitator and in fact mirrors draft notes taken by the facilitator ( Employer Exhibits 3, 4, and 7). The Agreement does not specifically refer to the Petrie Model or to how or if night shift differential is to be paid. However, the Agreement gives sufficient data to indicate that the Petrie Model was selected and that the Kings Highway model was rejected.

It was the testimony of Dallas Piana that during the discussions on the issue of flex, several models of flex were discussed. Two of the models discussed were the Petrie Model and the Kings Highway model. The differences between the models are noted below:

| Petrie | Kings Highway |
|---|---|
| 4 week schedule consists of Thirteen 11.5 hours shifts as follows: 34.5/ 34.5/ 34.5/46 hours per week Employee is paid for actual hours worked each week | 4 week schedule consists of Twelve 12 hour shifts as follows: 36 hours each week Employee works 36 hours but is paid for 37.5 hours each week which consists of 1.5 hours of holiday time per week |
| Three 15 minutes paid breaks per shift | Three 15 fifteen minutes paid breaks per shift |
| One unpaid meal break | One paid half-hour meal break |
| Hours of work are: 7am to 7pm or 7pm to 7am | Same |
| No night shift differential is paid to the 7 am to 7 pm shift | 4 hours night shift differential is paid to the 7 am to 7 pm shift for the hours 3 pm to 7 pm |

3

| | |
|---|---|
| 11.5 hours of night shift differential paid to the 7pm to 7 am shift | 12 hours night shift differential paid to the 7 pm to 7 am shift |
| Registered Nurses are scheduled for every other weekend off | Registered Nurses are scheduled for every third weekend off |

Dallas Piana and Carmen Suardy both testified that the Kings Highway model was rejected due to its cost, wasteful aspects (pay for a lot of time that is not worked) and other inefficiencies fully known to the parties at the time due to an arbitration decision issued in June 2001 (Employer Exhibit 5). Also, the Kings Highway model is clearly inconsistent with the mutually identified interests of the parties to be mindful of the fiscal limitations of the Employer.

Following conclusion of the negotiations, Ms. Piana testified that the Petrie Model was indeed implemented at Kings Highway in every respect except that the nurses in the nursing units where flex was implemented are scheduled to be off every third weekend if the staffing of the units permits it, and if the Medical Center does not incur additional cost by allowing nurses to be off every third weekend. This exception to the Petrie model was agreed to with the Kings Highway group in an effort to get the support of the Kings Highway representatives for the Level 3 Agreement (See Union 6).

Ms. Suardy testified that the Kings Highway representatives were not pleased that the flex model to be implemented in the nursing units was going to be the Petrie model and showed their displeasure by not signing the agreement. (See Employer 9 and Union 4). Maureen Woodroffe testified that she refused to sign the Level 4 and Level 3 Agreements because she learned that the flex model to be implemented in the nursing units was the Petrie Model. Ms Woodroffe confirmed Ms. Suardy's testimony.

It should be noted that Norma Amsterdam, the Executive Director for the RN Division of 1199 did, in fact, sign all the Agreements reached.

A mistake was made in the implementation of the agreement in that the nurses who work flex hours on the day shift (7 a.m. to 7 p.m.) were paid a night shift differential for a short period of time (October 2002 to August 2005). This does not change the Agreement reached as to the flex model to be implemented. Dallas Piana testified that as soon as she discovered the error, the Union was notified and the payments stopped. The two Union representatives who refused to sign the Agreement cannot achieve through this grievance what they could not achieve through the bargaining process. These few renegades are trying to circumvent the agreed to process.

The Union argues that Ms. Suardy's and Ms. Piana's testimony should be ignored because the "Agreement is clear." The Agreement is far from clear on the issue of night shift differential. There is no mention of it at all. However, the Agreement is very clear that the interest-based problem solving process was used. Ms. Suardy's and Ms. Piana's testimony concerning the process and the fact that it requires a lot of discussion, active listening and sharing of information is most relevant. The Union cannot expect to place



the Agreement in evidence and then preclude the Employer from explaining the terms found therein.

The Union relies on a 1991-1992 Agreement as the basis for the payment of the night shift differential.  (Union Exhibit 3). This Agreement has limited applicability. It should be noted that the 1991-1992 Agreement was entered into by the then Kings Highway Hospital and 1199. The Kings Highway Hospital was purchased by Beth Israel in 1994 and was thereafter known as the Kings Highway Division of Beth Israel. The only units of the Kings Highway Hospital on flex schedules at the time of the Agreement were the Emergency Department, the Intensive Care Unit and the Cardiac Care Unit. The 1991-1992 Agreement applies to those units only. Since 1994, Beth Israel Medical Center has negotiated its own Agreements with 1199 and has chosen to NOT expand the old flex Agreements entered into by the Kings Highway Hospital.

It was not until 2001 that Beth Israel agreed to expand the use of flex schedules to other nursing units of the Kings Highway division. The parties used the Interest-Based problem solving process in agreeing to expand flex. The payment of night shift differential to employees who are working what is really a DAY shift is inconsistent with the goals set by the parties in the negotiations. One must ask, what MUTUAL interest is served by this payment? The answer is none.

It is also inconsistent with the Interest-Based problem solving process to argue that the parties agreed to a flex "model" but that the elements of the "model" were not fully discussed and or "heard" by those who participated in the discussions. The testimony offered in support of the grievance in incredible.

## Conclusion

The Employer did not violate the Agreement by refusing to pay the night shift differential to the nurses who work 7 a.m. to 7 p.m. in the units where flex schedules were implemented as a result of the 2001 Agreement.

The last paragraph of the Agreement is worthy of note in connection with this arbitration proceeding. It states that "if the solutions set forth above, once implemented, do not enable the parties to reach their goals, or if a new problem pertaining to the issue statement is identified that requires resolution, the parties shall meet and develop a new solution to the problem using the Interest-Based process. Either party may raise issues relative to the solutions agreed upon herein at any time during the term of this agreement. Anything in this Agreement to the contrary notwithstanding, absent a mutually agreeable resolution neither party is required to agree to, nor shall an arbitrator have the authority to order, a modification of the provisions of this Agreement."

The arbitrator should make note of the fact that this is not the traditional case where the union is grieving a violation of the contract. As noted above, the Executive Director of the Union signed the Agreement and did not testify at the hearing. What we have is a few nurses who agreed to participate in a process and are now rejecting it because they do not like aspects of the agreed upon solutions. They want to have the arbitrator modify what was agreed to.

For the foregoing reasons, the Medical Center respectfully requests that the grievance be denied.

Respectfully submitted,

Melissa Greiner
Manager
Labor & Employee Relations

6

# UNION EXHIBIT D

**BethIsrael**

Academic Affiliate of
Manhattan Campus for
the Albert Einstein College
of Medicine

Human Resources
**Labor Relations**
**Beth Israel Medical Center**
305 First Avenue
New York, NY 10003

WeHealNewYork.org

January 26, 2007

Robert T. Simmelkjaer
Arbitrator
c/o Mariana Tinizhanay
Case Manager
American Arbitration Association
1633 Broadway, 10th Floor
New York, NY  10019

Re:    Failure to pay night shift differential to Registered Nurses
       AAA Case No.: 13-300-02379-05

Dear Arbitrator Simmelkjaer:

Beth Israel Medical Center submits this reply to the Union's post-arbitration brief in the above captioned matter.

The Union's attempt to confuse the issue and misapply the facts is clear from the outset wherein they misstate the issue.   In the Union's brief, the issue is missing the units that are in question in this matter.  The actual issue that was agreed to was: Did the employer violate the collective bargaining agreement when it ceased to pay night shift differential to RNs at the Kings Highway Division who work 7 a.m. - 7 p.m. flex on *2 North, SSU and 3 East*?  If so what shall be the remedy?  The only units that are at issue in this matter are 2 North, SSU and 3 East, which were the new units where flex was to be implemented pursuant to the 2002 Level 3 Agreement (Union 4).  The other flex units, Emergency Department, Intensive Care Unit and the Cardiac Care Unit, are not in dispute in this case.  The flex schedules in these units (ED, ICU and CCU) were put in place by Kings Highway Hospital before it was purchased by Beth Israel.  The only units at issue here are those where flex was implemented pursuant to an agreement with Beth Israel Medical Center (See Union 4).

It appears that the Union conveniently misstates the issue in an attempt to give credence to their argument that there was a past practice in paying the night shift differential between the hours of 5 p.m. to 7 p.m.  The only units that are in question in this matter, 2 North, SSU and 3 East, were mistakenly paid the night shift differential for a short period of time, **not** fifteen years as the Union incorrectly states.  This short period of time that

    

the night shift differential was mistakenly paid by no means constitutes a past practice. The Union is attempting to bolster its argument by misrepresenting the facts, specifically, by including all of the units that are flex rather than the units that are at issue in this case.

In addition, the Union's argument that a negative inference should be taken against the Employer for not calling Norma Amsterdam as a witness is without merit. Norma Amsterdam is the Executive Vice President of 1199 and she did sign all agreements. Ms. Amsterdam is not the one who is claiming a violation of the agreement. It is the Kings Highway representatives who are claiming a violation and they are the (only) ones that refused to sign the agreements. Further, Ms. Suardy's testimony was undisputed. Contrary to the Union's argument that the Employer failed to call Ms. Amsterdam as a witness, the Union failed to call Ms. Amsterdam as a witness to rebut any of Ms. Suardy's testimony regarding "Ms. Amsterdam's alleged understandings." The burden was on the Union to refute Ms. Suardy's testimony and they failed to do so.

Furthermore, the Union claims that Patricia O'Brien's crossed out signature on the Level 4 Agreement (Employer 9) had nothing to do with the fact that the new flex units were going to be based on the Petrie Model. However, the Union fails to mention that Maureen Woodroffe's signature is also crossed out (See Employer 4) and she did, in fact, testify that the reason she crossed out her signature was that she learned that the new flex units were going to be based on the Petrie Model.

Respectfully submitted,

Melissa Greiner
Manager
Labor & Employee Relations
Beth Israel Medical Center

cc:  Barry Peek

# UNION EXHIBIT E

# MEYER, SUOZZI, ENGLISH & KLEIN, P.C.

COUNSELORS AT LAW

990 STEWART AVENUE, SUITE 300
P.O. BOX 9194
GARDEN CITY, NEW YORK 11530-9194
516-741-6565
FACSIMILE: 516-741-6706

ONE COMMERCE PLAZA
SUITE 1102
ALBANY, NEW YORK 12260
518-465-5551
FACSIMILE: 518-465-2033

1350 BROADWAY, SUITE 501
P.O. BOX 822
NEW YORK, NEW YORK 10018-0026
212-239-4999
FACSIMILE: 212-239-1311
E-MAIL: meyersuozzi@msek.com
WEBSITE: http://www.msek.com

1300 CONNECTICUT AVENUE, N.W.
SUITE 600
WASHINGTON, DC 20036
202-955-6340
FACSIMILE: 202-223-0358

425 BROADHOLLOW ROAD, SUITE 405
P.O. BOX 9064
MELVILLE, NEW YORK 11747-9064
631-249-6565
FACSIMILE: 631-777-6906

**BARRY J. PEEK**
DIRECT DIAL: 212-763-7001
E-MAIL: BPEEK@MSEK.COM

January 30, 2007

Arbitrator Robert T. Simmelkjaer
c/o Mariana Tinizhanay, Case Manager
American Arbitration Association
1633 Broadway, 10th Floor
New York, New York 10019

> Re:  Failure to pay nightshift differential to Registered Nurses
>       AAA Case No. 13 300 02379 05
>       Our File No. 07453.0580

Dear Arbitrator Simmelkjaer:

I am submitting this letter on behalf of Local 1199 in reply to Beth Israel's recent response dated January 26, 2007.

Contrary to the Hospital's contention, at no time did the union try to confuse the issue that is before the Arbitrator. The argument that there is a well established past practice is not changed by the clarification set forth in the Hospital's letter of January 26, 2007.

Contrary to the Hospital's belief, there has been a clear understanding of how the various MOA's regarding the nurses at the Kings Highway Division have been interpreted. The simple facts are that the Kings Highway Nurses who worked a flex shift, including the 7 A.M. to 7 P.M. shift received night differential. This practice covered nurses in the Emergency Department, Intensive Care Unit, the Critical Care Unit, 2 North, SSU and 3 East. The only difference is that the ED, ICU and the CCU received the night differential for more than 20 years and the later units received it from 2002 immediately after the Interest Based Bargaining, until August 2005 when the Hospital unilaterally changed the way the contract was being implemented.

These facts do not weaken Local 1199's position in any way. To the contrary, the facts reinforce 1199's case. The Hospital cannot escape the simple reality that once the 2002 Agreement was reached the Hospital applied the flex language and night shift differential provisions for the Kings Highway nurses assigned to 2 North, SSU and 3 East in the same manner it applied the agreements for the past twenty (20) years. That is, for more than three (3) years the Hospital paid the shift differential even for nurses in Kings Highway who worked the

January 30, 2007
Page 2

flex shift during the hours 7:00A.M. to 7:00 P.M.  This was consistent with the many years of applying the contract to the flex shifts.

The other simple fact is that the Hospital points to no other written agreement which indicates that the parties agreed to change that practice.  Surely, if the Hospital had such an agreement, it would have produced it.

In conclusion, both the written agreements and the past practice support Local 1199's position in this case.  As a result the grievance must be granted in all respects.

Respectfully submitted,

BARRY J. PEEK

cc:  Melissa Greiner

# UNION EXHIBIT F

*ER #5*

AMERICAN ARBITRATION ASSOCIATION

- - - - - - - - - - - - - - - - - - x

In the Matter of the Arbitration

    between

LOCAL 1199, SEIU

    and

BETH ISRAEL MEDICAL CENTER
KINGS HIGHWAY HOSPITAL

Case No. 13-300-01422-00
(Flex Schedule agreement)

- - - - - - - - - - - - - - - - - - x


## OPINION AND AWARD

    Pursuant to the terms of a collective bargaining agreement, the undersigned Arbitrator was selected in accordance with the rules of the American Arbitration Association to hear and decide a dispute between the parties. A hearing was held on February 12, 2001, at the offices of the American Arbitration Association in New York City, at which both parties appeared through counsel who presented evidence and made arguments. The Union was represented by Deborah Singer, Esq., and the Hospital was represented by Christopher Berner, Esq. The parties also submitted post-hearing briefs. Based upon all of the evidence presented and arguments made, the Arbitrator renders this Opinion and Award.

<u>Issue</u>

The parties could not agree to a statement of the issue, so the Arbitrator states the issue as follows:

Has the Hospital improperly paid Registered Nurses who have worked 12-hour shifts under the Flex Schedule agreement in effect since May 29, 1988, for their meal periods? If so, what shall be the remedy?


<u>Facts</u>

The facts of this case are not in dispute. Some time prior to the spring of 1988, the nurses who worked in the C.C.U. and I.C.U. at Kings Highway Hospital Center asked whether Kings Highway Hospital was interested in permitting them to work 12-hour shifts instead of the regular eight-hour shifts. At that time, Kings Highway Hospital was not interested; however, in the spring of 1988, Kings Highway Hospital informed the nurses that it would consider such a schedule. As a result, Dorothy Kaloglu reviewed provisions relating to flex schedules in agreements at several other hospitals, and she drafted a proposal she thought would work at Kings Highway Hospital. After several negotiation sessions, the parties entered into what is called the Flex Schedule agreement.

The Pilot Program was implemented effective May 29, 1988, for a six-month trial period, and it permitted the Registered Nurses in the C.C.U. and I.C.U to work 12-hour shifts, three days a week, on a temporary basis for six months. Since employees generally worked 37 1/2 hours, the parties agreed that the nurses on the flex schedule would work an extra 12-hour shift every six weeks. The Flex Schedule agreement also provided that the flex schedule 12-hour shifts would

become permanent unless either party wanted to revert to eight-hour shifts. Neither party objected, and the flex schedule 12-hour shifts have continued in effect for I.C.U. nurses ever since, and for the E.R. nurses as the result of a subsequent agreement.

In relevant part, the Flex Schedule agreement states as follows:

1)  The Pilot Program shall be implemented effective May 29, 1988 and shall continue for a period of six months.  At the end of six months, if the Hospital and the Registered Nurses agree, 12 hour shifts will be considered the permanent staffing pattern for the units involved unless changed by further contractual agreement.

2)  The work week will consist of three 12 hour tours of duty.  No nurse shall be scheduled to work more than two (2) consecutive days in a row, except when mutually agreed.

3)  Shifts will be 7:00 A.M. to 7:00 P.M. and 7:00 P.M. to 7:00 A.M....

4)  Shifts will include one 1/2 hour meal period and three (3) fifteen (15) minute coffee breaks....

8)  Nurses will work a 36 hour week and will work one (1) extra shift in each sixth (6) week schedule....

In addition, the parties had agreed, although it was not reduced to writing, that the nurses in the flex schedule units could give back benefit days, calculated as eight per year, instead of working the extra shift every six weeks, and most of the flex schedule nurses gave back eight benefit days rather than work the extra shifts.

In or about 1995, Beth Israel Medical Center (referred to hereinafter as the Hospital) took over Kings Highway Hospital.  No change was made in the flex schedule arrangement that had existed

since the Flex Schedule agreement was implemented in 1988. However, in late 1999 or early 2000, the Hospital calculated how many hours the nurses on flex schedule actually worked each week, and determined that these nurses worked less than the 37 1/2 hours for which they received pay. As a result, the Hospital proposed to pay the nurses on flex schedule for the hours they actually worked. The Union objected to the Hospital's proposal, citing the language of the Flex Schedule agreement and the practice that had been in effect for more than ten years, and it filed a grievance contesting the Hospital's proposed change in paying the nurses on the flex schedule. When the parties could not resolve the matter, the Hospital agreed to maintain the existing practice pending the outcome of the arbitration.

## Positions of the Parties

The Union argues that the plain language of the Flex Schedule agreement negotiated in 1988, the unrebutted testimony of the Union witnesses present when this agreement was negotiated, and the consistent practice since the implementation of the Flex Schedule agreement establishes that the half-hour meal break was intended to be included in the calculation of paid work hours for nurses who work under the Flex Schedule agreement, and that the half-hour meal break has been properly included in the calculation of paid work hours for these nurses. The Union asserts that the Flex Schedule agreement recognized that the nurses covered by this agreement were scheduled for 36 hours each week and, as a result, the agreement required these nurses to work an extra 12-hour shift every six weeks. The Union submits that for the reasons stated, the grievance should be upheld.

4

The Hospital contends that the Union incorrectly assumes that Kings County Hospital agreed to pay the nurses covered by the Flex Schedule agreement for their half-hour meal breaks. The Hospital argues that the Flex Schedule agreement clearly does not provide for a paid meal break because it refers to a 12-hour "shift" rather than a 12-hour "workday." According to the Hospital, this reference to a 12-hour "shift" is consistent with the Agreement which includes seven and one-half paid hours for working the regular 8-hour "shift." The Hospital maintains that just as the nurses who work the regular 8-hour shift are not paid for the half-hour meal break, the nurses on the flex schedule who work 12-hour shifts should not be paid for their half-hour meal break. The Hospital also argues that to "include" the meal break in the shift does not mean being "paid" for the meal break, and that if the parties had intended to pay for the meal break, they would have said so.

The Hospital further argues that, at best, the language of the Flex Schedule agreement is ambiguous, and since this language was drafted by representatives of the Union, any ambiguity must be resolved against the Union. The Hospital asserts that to pay the nurses on flex schedule for their meal break would be a significant departure from the terms of the Agreement, and was too important not to have been expressly stated in the Flex Schedule agreement. The Hospital submits that the Flex Schedule agreement must be interpreted consistently with other terms of the Agreement, that by doing so, the intent of the parties' in this agreement becomes clear, i.e, that the flex schedule nurses were not to be paid for their half-hour meal break, and that the Hospital is not obligated to pay the nurses on

the flex schedule for hours they do not actually work.  In sum, the Hospital asks that the Union's grievance be denied.

## Discussion

The Hospital is correct in its assertion that the nurses who work a 12-hour shift under the Flex Schedule agreement should not be paid for their half-hour meal break unless the Flex Schedule agreement so provides.  However, and despite the Hospital's argument that to "include" the meal break in the 12-hour shift does not mean to "pay" for the meal break, the clear and unambiguous language of the Flex Schedule agreement requires the Hospital to pay these nurses for their half-hour meal break.  Paragraph 2 of the Flex Schedule agreement states, "The work week will consist of 12 hours tours of duty," paragraph 3 states, "Shifts will be 7:00 A.M. to 7:00 P.M. and 7:00 A.M. to 7:00 A.M." and Paragraph 4 states, "Shifts will include 1/2 hour meal break and three (3) fifteen (15) minute coffee breaks." Unlike the Agreement which defines the regular workday as "exclusive of an unpaid lunch period," the Flex Schedule agreement contains no such language, and includes the meal break with the three paid coffee breaks, thereby clearly showing that it was the parties' intention to pay for the meal break as part of the nurses' 12-hour flex shift.

A further indication of the parties' intention to pay the nurses on flex schedule for their meal breaks is Paragraph 8 of the Flex Schedule agreement which states, "Nurses will work a 36 hour week and will work one (1) extra shift in each sixth (6) week schedule."  It is apparent that the parties recognized that nurses working the flex schedule would not be working the full 37 1/2 hours

that five-day nurses worked, so the parties required nurses working the flex schedule to work an extra shift every six weeks. Indeed, any doubts about what the parties actually intended is resolved by the consistent past practice from the first day the Flex Schedule agreement was implemented, until the Hospital questioned the payment of these nurses some four years after it took over Kings County Hospital. Thus, it is not necessary to consider the unrebutted testimony of the Union's witnesses which confirmed the manner in which the nurses on flex schedules have been paid since 1988.

Therefore, based on the facts and circumstances of this case, and for the reasons explained, the Arbitrator issues the following

## Award

The Hospital has not improperly paid Registered Nurses who have worked 12-hours shifts under the Flex Schedule agreement in effect since May 29, 1988, for their meal breaks. The Hospital shall continue to pay these nurses for meal breaks. It is so ordered.

_Richard Adelman_
RICHARD ADELMAN

STATE OF NEW YORK)
                 ) ss.:
COUNTY OF NASSAU )

I, RICHARD ADELMAN, do hereby affirm upon my oath as Arbitrator, that I am the individual who executed the foregoing instrument, which is my Opinion and Award.

Dated: June 21, 2001

_Richard Adelman_
RICHARD ADELMAN