UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

BETH ISRAEL MEDICAL CENTER,

                    Plaintiff,

            - against -

1199/S.E.I.U. UNITED HEALTHCARE WORKERS
EAST, d/b/a LOCAL 1199/S.E.I.U. NATIONAL
HEALTH AND HUMAN SERVICE EMPLOYEES
UNION,

                    Defendant.

_____

07 Civ. 6254 (MGC) (KNF)


**MEMORANDUM OF LAW IN SUPPORT OF
BETH ISRAEL MEDICAL CENTER'S PETITION TO
VACATE ARBITRATION AWARD AND IN OPPOSITION
TO 1199/S.E.I.U. UNITED HEALTHCARE WORKERS
EAST'S MOTION FOR JUDGMENT CONFIRMING
ARBITRATION AWARD AND DISMISSING EMPLOYER'S
<u>PETITION TO VACATE AWARD</u>**


EDWARDS ANGELL
PALMER & DODGE LLP
David R. Marshall
Jason R. Bogni
Attorneys for Plaintiff
750 Lexington Avenue
New York, New York 10022
212.308.4411

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................... iii

PRELIMINARY STATEMENT ..............................................................................1

STATEMENT OF FACTS .......................................................................................2

    Background .........................................................................................................2

    The Parties Negotiate Flextime Shifts At BIMC Using Interest Based
    Problem Solving.................................................................................................4

    The Hospital Realizes An Error, Corrects It, And The Union Files A Grievance...........5

    The Arbitrator's Award .....................................................................................6

ARGUMENT.............................................................................................................7

I.     THE ARBITRATION AWARD SHOULD BE VACATED BECAUSE THE
ARBITRATOR EXCEEDED HIS POWER BY IGNORING AN EXPRESS DIRECTIVE IN
THE AGREEMENT AND GOING BEYOND THE AGREEMENT TO ADD A NEW
PROVISION .............................................................................................................7

    A.    The Applicable Legal Standards........................................................7

    B.    The Award Should Be Vacated Because The Arbitrator Exceeded His Power
        When He Ignored The Express Directive In The Agreement Requiring The
        Parties To Use The IBPS Process To Solve Implementation Problems ............. 9

    C.    The Award Should Be Vacated Because The Arbitrator Exceeded His Power By
        Going Outside The Agreement To Add A Provision On Which The Agreement
        Was Silent ..............................................................................................12

    D.    The Union's Motion To Confirm The Award Should Be Denied Because The
        Union's Reliance On The 1988, 1989 And 1991 MOAs Is Flawed.....................14

        1.    The The Union's Argument That The Arbitrator Acted Within His
            Powers When He Relied On The 1988, 1989 And 1991 MOAs Lacks
            Merit ...............................................................................…..…….14

        2.    The Union's Argument That The 1988, 1989 And 1991 MOAs
            Apply To All RNs Who Work Flextime Shifts At Kings Highway
            Lacks Merit ...........................................................................15

3.    There Is No Merit To The Union's Argument The 2002 Agreement Had
      To Affirmatively "Negate" The Payment Of Shift Differential To
      Those In The New Flextime Shifts ........................................................... 19

4.    The Union's Argument That The Hospital Is Estopped From Arguing
      That The 1988,1989 And 1991 MOAs Are Inapplicable to New
      Flextime RNs Lacks Merit ..................................................................... 20

II.    THE ARBITRATION AWARD SHOULD BE VACATED BECAUSE IT DOES NOT
CONFORM TO THE NEW YORK STATUTE OF FRAUDS AND IS THEREFORE
CONTRARY TO PUBLIC POLICY ............................................................................. 23

CONCLUSION .............................................................................................................. 25

# TABLE OF AUTHORITIES

**Page**

## Federal Cases

Barrentine v. Arkansas-Best Freight Sys., Inc., 450 U.S. 728, 101 S. Ct.1437 (1981) ... 7

Beth Israel Medical Center v. Local 814, Int'l Brotherhood of Teamsters,
    2000 U.S. Dist. LEXIS 13547 (S.D.N.Y. September 20, 2000) ............10, 11, 24

Cohon & Co. v. Russell, 23 N.Y.2d 569, 297 N.Y.S.2d 947 (1969)...............................23

Collins & Aikman Floor Coverings Corp. v. Robert Froehlick, 736 F. Supp. 480
    (S.D.N.Y. 1990) ........................................................................................ 9

DeRosis v. Kaufman, 219 A.D.2d 376, 641 N.Y.S.2d 831 (1st Dep't 1996).................23

Giles v. City of New York, 41 F. Supp. 2d 308 (S.D.N.Y. 1999) ...................................21

Harry Hoffman Printing, Inc., v. Graphic Communications Int'l Union, Local 261,
    950 F.2d 95 (2d Cir. 1991)............................................................................. 8

Int'l Organization of Masters, Mates & Pilots v. Trinidad Corp., 803 F.2d 69
    (2d Cir. 1986)............................................................................................23

Leed Architectural Prods., Inc. v. United Steelworkers of Am., Local 6674,
    916 F.2d 63 (2d Cir. 1990)................................................................ 7, 8, 9, 13, 14

Lehrer McGovern Bovis v. New York Yankees, 207 A.D.2d 256, 615 N.Y.S.2d 31
    (1st Dep't 1994) ........................................................................................23

LLT International Inc. v. MCI Telecommunications Corp., 18 F. Supp. 2d 349
    (S.D.N.Y. 1998)........................................................................................ .8

Midland Metals Corp. v. Cables de Comunicaciones, S.A., 1985 U.S. Dist. LEXIS
    14199 (S.D.N.Y. November 4, 1985) ............................................................. 8

National Cleaning Contractors, Inc. v. Local 32B-32J, Service Employees Int'l Union,
    833 F. Supp. 420 (S.D.N.Y. 1993) ................................................................. 9

Newsday, Inc. v. Long Island Typographical Union, 915 F.2d 840 (2d Cir. 1990),
    cert. denied, 499 U.S. 922 (1991) .................................................................23

Sen Mar, Inc., v. Tiger Petroleum Corp., 774 F. Supp. 879 (S.D.N.Y. 1991).................23

Techcapital Corp. v. Amoco Corp., 2001 U.S. Dist. LEXIS 2822
    (S.D.N.Y. March 19, 2001)............................................................................. 9

Torrington Co. v. Metal Prods. Workers Union Local 1645, 362 F.2d 677
        (2d Cir. 1966)..............................................................................................13, 15

Transaero, Inc. v. La Fuerza Aerea Boliviana, 162 F.3d 724 (2d Cir. 1998) ...................21

Union Appointed Trustees of The Tapers Industry Ins. & Annuity Funds v. Employer-
        Appointed Trustees of The Tapers Industry Ins. & Annuity Funds, 714 F. Supp.
        104 (S.D.N.Y. 1989)..............................................................................9, 11, 15

## Statutes

N.Y. Gen. Obl. Law §5-701 ..........................................................................................23

## PRELIMINARY STATEMENT

In 2001 Beth Israel Medical Center (the "Hospital" or "BIMC") and 1199/SEIU United Health Workers East (the "Union"), in anticipation of the expiration of their collective bargaining agreement, agreed to adopt a non-traditional method of dispute resolution, "Interest Based Problem Solving" (sometimes referred to as "IBPS") pursuant to which the parties work with a facilitator to develop mutually agreeable "solutions" to all problems. Accordingly, when the Hospital and the Union entered into a new collective bargaining agreement in 2002 (the "Agreement"), the Agreement provided that should a problem arise with implementation of "solutions" set forth in the Agreement, or should a new problem arise under the Agreement after its execution, "the parties shall meet and develop a new solution to the problem using the Interest-Based process." Consistent with the Interest Based Problem Solving approach, the Agreement further provided that, should the parties be unable to achieve a "mutually agreeable resolution, neither party is required to agree to, nor shall the arbitrator have the authority to order, a modification" of the Agreement.

Shortly after the execution of the Agreement, a problem did arise regarding whether certain dayshift flextime nurses working flextime hours were entitled to extra night shift pay ("Night Shift Differential") for certain hours of work. The Union responded by filing a grievance seeking payment of Night Shift Differential. After an evidentiary hearing, an arbitrator found that the Agreement was silent on the issue of payment of Night Shift Differential to the dayshift flextime nurses. Instead, however, of directing the parties to "develop a new solution to

1

the problem using the Interest-Based process" as the Agreement required, the arbitrator ordered

the Hospital to pay Night Shift Differential to the dayshift flextime nurses.

This award should be vacated because (i) the arbitrator exceeded his power by

failing to abide by explicit directives in the Agreement requiring that all problems between the

parties be settled through Interest Based Problem Solving, and (ii) the arbitrator exceed his power

by adding a provision to the Agreement on an issue – payment of Shift Differential to certain

dayshift flextime nurses – on which the Agreement was silent.  The award should also be vacated

because it is contrary to public policy in that it conflicts with the New York Statute of Frauds by

enforcing an alleged promise that is not in writing and cannot be performed within one year.

## STATEMENT OF FACTS[1]

Background

In 1988, the Union and Kings Highway Hospital, a predecessor to Plaintiff BIMC,

entered into an agreement (the "1988 MOA") that changed the shift structure for registered

nurses ("RNs") working in the Critical Care Unit ("CCU") and Intensive Care Unit ("ICU") by

replacing traditional eight-hour shifts with twelve-hour or "flextime" shifts. (Pet. ¶ 5, Ex. 1.)[2]

The 1988 MOA provided for two flextime shifts – a dayshift from 7:00 A.M. to 7:00 P.M. and a

night shift from 7:00 P.M. to 7:00 A.M. – and payment of a Night Shift Differential for work on

---

[1] A more detailed statement of the relevant facts is contained in BIMC's Verified Petition ("Petition") to which BIMC respectfully refers the Court.

[2] References to "Pet." are to the paragraphs of the Petition and the exhibits attached thereto.

the night shift. (Pet. Ex. 1.) Flextime RNs were entitled to a half hour paid lunch break and were required to work three 12-hour shifts each week (Pet. Ex. 1.)[3]

In December 1989, the Union and Kings Highway Hospital entered into an agreement (the "1989 MOA") that modified the flextime provision of the 1988 MOA to provide for payment of the Night Shift Differential to RNs in the CCU, ICU and ER (the "1988 Flextime Shifts") on the daytime shift for any hours worked between 3:00 P.M. and 7:00 P.M. (Pet. ¶ 8, Ex 2.) In November 1991, the Union and Kings Highway Hospital entered into another agreement (the "1991 MOA") that increased the Night Shift Differential for RNs who worked regular, non-flextime shifts at night and confirmed the payment of the increased Shift Differential to RNs in the 1988 Flextime Shifts for hours they worked from 3:00 P.M. to 7:00 P.M. (Pet. ¶ 9, Ex. 3.)

In August 1994, BIMC purchased Kings Highway Hospital, which then joined two other hospitals, Petrie and Singer, as operating divisions of BIMC. (Pet. ¶ 1, 10.) At the time of the Kings Highway Hospital purchase, the collective bargaining agreement governing flextime RNs in the Petrie Division was not identical to the collective bargaining agreement governing flextime RNs in the Kings Highway Division ("Kings Highway"). In the Petrie Division, flextime RNs worked 11.5-hour shifts (in contrast to twelve-hour shifts for the 1988 Flextime Shift RNs at Kings Highway), thirteen shifts every four weeks (in contrast to three shifts every week for the 1988 Flextime Shift RNs at Kings Highway), with an unpaid half-hour

---

[3] The parties agreed to add the Kings Highway Hospital Emergency Room nursing unit ("ER") to the flextime shift program established in the 1988 MOA later in 1988. (Pet. Ex. 10.)

3

lunch break (rather than the paid lunch at Kings Highway). (Pet. ¶ 11, Ex. 4.) In the Petrie

Division, flextime nurses were paid a Night Shift Differential only for shifts ending after 7:00

P.M. (in contrast to Kings Highway where 1988 Flextime Shift RNs were paid Night Shift

Differential for hours worked from 3:00 P.M. to 7:00 P.M.). (Pet. Ex. 4.)

The Parties Negotiate Flextime Shifts At
BIMC Using Interest Based Problem Solving

      In May 2001, the Union and BIMC entered into an agreement to conduct

bargaining for a new collective bargaining agreement for the RNs at the three BIMC divisions,

Kings Highway, Petrie, and Singer, using Interest Based Problem Solving. (Pet. ¶ 12, Ex 5.) The

IBPS process involves consensus decision making whereby the parties work together, under the

guidance of a facilitator, to resolve all issues in order to arrive at a decision that everyone can

support. (Pet. ¶ 13, Ex. 6.)

      Using Interest Based Problem Solving, the Hospital and the Union reached an

agreement dated February 21, 2002 (the "Agreement") which provides for, among other things,

the creation of new flextime shifts in BIMC's three divisions, including new flextime shifts in

three nursing units at Kings Highway that had not previously allowed them: 2 North, 3 East, and

the Surgical Stepdown Unit ("SSU") (the "New Flextime Shifts"). (Pet. ¶ 14, 15, Ex. 7.) In

structuring the working conditions for the New Flextime Shifts, the Agreement expressly adopts

the Petrie flextime model with 11.5-hour shifts, an unpaid half-hour lunch, and a requirement

that nurses work 13 flextime shifts every four weeks. (Pet. ¶ 16, Ex. 7.) Consistent with the

Petrie model, the Agreement does not provide for payment of Night Shift Differential for hours

worked from 3:00 P.M. to 7:00 P.M. (Pet. Ex. 7.) It is silent on the issue.

4

The Agreement explicitly requires the parties to reach solutions to problems arising from its implementation using Interest Based Problem Solving.  (Pet. Ex. 7, p. 9.)  According to the Agreement:

> [if] the solutions set forth [in the Agreement] do not enable the parties to reach their goals, or if a new problem pertaining to the [goal of the Agreement] is identified that requires resolution, the parties shall meet and develop a new solution to the problem using the Interest Based [Problem Solving] process. (Pet. Ex. 7, p. 9.)

Moreover, should the parties not be able to reach a consensus decision as to a particular matter, the Agreement specifically denies an arbitrator authority to order a resolution that modifies the terms of the Agreement:

> [A]bsent a mutually agreeable resolution neither party is required to agree to, nor shall an arbitrator have the authority to order, a modification of the provisions of this Agreement. (Pet. Ex. 7, p. 9.)[4]

The Hospital Realizes An Error, Corrects It,
And The Union Files A Grievance

In July 2005, the Hospital discovered that it was erroneously paying RNs working New Flextime Shifts at Kings Highway a Night Shift Differential for hours worked from 3:00 P.M. to 7:00 P.M.  (Pet. ¶ 21, Ex. 9.)  Because this payment was not provided for in the Agreement, and was not consistent with the Petrie model upon which the New Flextime Shifts

---

[4] The Agreement expires on April 20, 2011.  (Pet. ¶ 20, Ex 8, p. 2.)

5

were based, the Hospital, on August 7, 2005, gave notice of the error to the Union, notified the

Union that the Hospital intended to stop making the payment, and invited the Union to discuss

the issue. (Pet. ¶ 21, Ex. 9.)  The Union did not contact the Hospital before the payments were

discontinued in the New Flextime Units (Pet. ¶ 21, Ex. 9.) [5]

After the discontinuance, the Union filed a grievance seeking reinstatement of the

Night Shift Differential for the New Flextime Shifts at Kings Highway, which the Hospital

denied by decision dated September 27, 2005. (Pet. ¶ 22, Ex 10.)  The Union then filed a

Demand for Arbitration with the American Arbitration Association challenging the Hospital's

discontinuance of Night Shift Differential.  (Pet. ¶ 23.)  Arbitrator Robert T. Simmelkjaer (the

"Arbitrator") held hearings on the issue on April 7, 2006 and December 13, 2006.  (Pet. ¶ 23, Ex.

8.)

The Arbitrator's Award

The Arbitrator issued an Opinion And Award dated March 6, 2007 (the "Award")

in which he found that language regarding a "night shift differential is omitted from the 2002

Agreement" and characterized this omission as "compelling evidence." (Pet. Ex. 8, p. 18.)  The

Arbitrator also found that "there was no meeting of the minds" between the parties on the issue

of payment of Night Shift Differential to the RNs working the New Flextime Shifts.  (Pet. Ex. 8,

p. 18.)  Despite these findings, the Arbitrator disregarded the language of the Agreement that

---

[5] Flextime RNs in the CCU and ICU at Kings Highway continued to receive a Night Shift
Differential for the hours from 3:00 P.M. to 7:00 P.M. because the Agreement did not extinguish
their existing rights to the differential.  The Hospital has never stopped paying the differential to
those specific units.  (Pet. Ex. 7, p.5; Declaration of Carmen Suardy ("Suardy Decl.") ¶ 4.)

explicitly and unequivocally requires use of the IBPS process to correct implementation problems, and expressly deprives arbitrators of authority to modify or add provisions to the Agreement, and instead the Arbitrator ordered the Hospital to pay Night Shift Differential to the RNs working the New Flextime Shifts in the 2 North, 3 East, and SSU nursing units at Kings Highway. (Pet. Ex. 8, p. 17, 20.)[6]

## ARGUMENT

### POINT I

**THE ARBITRATION AWARD SHOULD BE VACATED BECAUSE THE ARBITRATOR EXCEEDED HIS POWER BY IGNORING AN EXPRESS DIRECTIVE IN THE AGREEMENT AND GOING BEYOND THE AGREEMENT TO ADD A NEW PROVISION**

**A.      The Applicable Legal Standards**

It is well established that "an arbitrator's power is both derived from, and limited by, the collective bargaining agreement." Barrentine v. Arkansas-Best Freight Sys., Inc., 450 U.S. 728, 744, 101 S. Ct. 1437 (1981). In further elucidating this seminal point, the Second Circuit has held that "[a]n arbitrator's authority to settle disputes under a collective bargaining agreement is contractual in nature, and is limited to the powers that the agreement confers." Leed Architectural Prods., Inc. v. United Steelworkers of Am., Local 6674, 916 F.2d 63, 65 (2d Cir. 1990).

---

[6] The entitlement of flextime RNs in the CCU and ICU at Kings Highway to Night Shift Differential for hours they worked from 3:00 P.M. to 7:00 P.M. was not before the Arbitrator because the Hospital did not stop paying Shift Differential to those RNs. (Pet. Ex. 8.)

An arbitrator exceeds his power when he fails to abide by explicit directives in a governing agreement. See LLT International Inc. v. MCI Telecommunications Corp., 18 F. Supp. 2d 349, 353-54 ("Because the arbitration award failed to comply with the Agreement's requirements, it manifestly disregarded the controlling authority[.]"); Midland Metals Corp. v. Cables de Comunicaciones, S.A., 1985 U.S. Dist. LEXIS 14199, *3-4 (S.D.N.Y. November 4, 1985) (remanding arbitration award because arbitrators failed to adhere to paragraph of agreement regarding scope of award). Similarly, the Second Circuit has held that an arbitrator may not "directly contradict[] the express language of the collective bargaining agreement." Leed Architectural, 916 F.2d at 65.

An arbitrator also exceeds his power when "the arbitrator must have based his award on some body of thought, or feeling, or policy, or law that is outside the contract[.]" Harry Hoffman Printing, Inc., v. Graphic Communications Int'l Union, Local 261, 950 F.2d 95, 98 (2d Cir. 1991). In Harry Hoffman, the Court vacated part of an award because the arbitral decision that the employer violated the concept of due process was "not based on express or properly-implied terms, but rather was improperly based upon the Panel members' particular notions of industrial justice." Id. at 99. Other courts have consistently applied this principle. See Leed Architectural, 916 F.2d at 66-67 ("If the reviewing court then determines that the arbitrator has derived his authority from sources outside the collective bargaining agreement, his award cannot stand.") (citing cases in U.S. Courts of Appeals in the 1st, 3rd, 4th, 5th, 6th, and 10th Circuits).

Further, a substantive issue is properly excluded from arbitration where the agreement "expressly limits or is construed to limit the powers of the arbitrators, hence,

8

narrowing the scope of arbitration" by the incorporation of a clause stating that the arbitrators "shall have no power to alter or modify any express provision" of the agreement. Collins & Aikman Floor Coverings Corp. v. Robert Froehlick, 736 F. Supp. 480, 484 (S.D.N.Y. 1990). The Court in Leed Architectural, 916 F.2d 63, explained that the purpose of the agreement language preventing the arbitrator from adding to or modifying terms is "to make the written contract the exclusive statement of the parties' rights and obligations." Id. at 66. An arbitrator who violates such a provision exceeds his powers. See Collins, 736 F. Supp. at 484.

When an arbitrator exceeds his power by ignoring the directives of the governing agreement, the award is properly vacated. See Union Appointed Trustees of The Tapers Industry Ins. & Annuity Funds v. Employer-Appointed Trustees of The Tapers Industry Ins. & Annuity Funds, 714 F. Supp. 104, 106 (S.D.N.Y. 1989). Further, when an arbitrator exceeds his power by basing his decision on matters outside the agreement, he is rewriting the contract, which is a proper basis for vacating the award. See Techcapital Corp. v. Amoco Corp., 2001 U.S. Dist. LEXIS 2822, *48-50 (S.D.N.Y. March 19, 2001) (vacating award where arbitrator "has reached out and rewritten a contract not put before it by the parties"); National Cleaning Contractors, Inc. v. Local 32B-32J, Service Employees Int'l Union, 833 F. Supp. 420, 423 (S.D.N.Y. 1993).

**B.    The Award Should Be Vacated Because The Arbitrator Exceeded His Power When He Ignored The Express Directive In The Agreement Requiring The Parties To Use The IBPS Process To Solve Implementation Problems**

The Agreement provides that when a problem regarding Agreement terms arises the parties are required to "meet and develop a new solution to the problem using the Interest-Based [Problem Solving] process." (Pet. Ex. 7 p. 9.) This provision sets forth the process, which

9

the Union specifically agreed to use for the purposes of collective bargaining with the Hospital,

that requires *the parties* to work together to resolve issues in order to arrive at a consensus. (Pet.

Ex. 5, Ex. 6.)  The provision applies to the omitted term regarding Night Shift Differential

payment because the issue was a "new problem" relating to implementation of the New Flextime

Shifts that "require[d] resolution" and which, if left unresolved, would not "enable the parties to

reach their goal" of staffing and paying for flextime shifts at the Hospital.  (See Pet. Ex. 7 p. 9.)

   The Arbitrator exceeded his power by ignoring the plain language of the

Agreement regarding how to resolve the issue being grieved.  A problem arose pertaining to the

goal of the Agreement when it was discovered that the Agreement was silent regarding the

payment of Night Shift Differential to RNs working the New Flextime Shifts, and, in fact, the

Arbitrator found that "there was no meeting of the minds on this issue." (Pet. Ex. 8 p. 18.)  The

Arbitrator, being bound by the power conferred in the Agreement, was obligated to comply with

the Interest Based Problem Solving provision in the Agreement and return the issue to the parties

for resolution.  When the Arbitrator ignored this obligation, and took it upon himself to resolve

the differential payment issue by requiring the Hospital to pay the differential, he exceeded his

power.  Legal precedent is clear that when an arbitrator exceeds his power in this way, his award

is properly vacated.

   In opposition to the Hospital's petition to vacate the Award, and in support of its

argument that the Award should be confirmed, the Union compares this case to Beth Israel

Medical Center v. Local 814, Int'l Brotherhood of Teamsters, 2000 U.S. Dist. LEXIS 13547

(S.D.N.Y. September 20, 2000), where the district court ruled that the arbitrator had not erred

when he found that the parties had agreed to an explicit modification of the shift pay provision in the parties' collective bargaining agreement as part of grievance settlement but simply failed to memorialize their settlement agreement in writing. Id. at *9-10. The Beth Israel case, however, is inapposite because in that case the arbitrator found that the parties had reached an actual meeting of the minds on the shift pay issue and he was simply called upon to enforce the terms of an actual (but unwritten) settlement agreement. In contrast, the issue in the instant case is not whether the parties had a meeting of the minds on the payment of night shift differential, but whether the Arbitrator, having determined that the Agreement was silent on the issue and there was no meeting of the minds, exceeded his authority when he supplied the missing term regarding shift differential rather than enforcing the explicit directive in the Agreement that the parties use Interest Based Problem Solving to resolve the shift differential dispute.

Arbitrator Simmelkjaer's actions -- which are contrary to an express provision in the Agreement limiting his power to resolve disputes -- are more akin to those of the arbitrator in the Union Appointed Trustees case, where the court found that the key question was not whether the arbitrator's interpretation of the contract was flawed, but whether he followed the contract at all. 714 F. Supp. at 104. In that case, the court vacated the arbitrator's award because it was made without giving consideration to the agreement's language about how to resolve the dispute. Id. Similarly, the Award in this case should be vacated because the Arbitrator failed to follow the IBPS provision of the agreement, which precludes him from deciding whether Night Shift Differential should be paid once he determined that the Agreement is silent on that issue.

11

C.    **The Award Should Be Vacated Because The Arbitrator**
      **Exceeded His Power By Going Outside The Agreement To**
      **Add A Provision On Which The Agreement Was Silent**

In his Order, the Arbitrator by his own admission, found the "night shift differential [for RNs working New Flextime Shifts] is omitted from the 2002 Agreement" and, further, that "there was no meeting of the minds" between the Hospital and the Union on the Night Shift Differential issue. (Pet. Ex. 8 p. 18.) Under the terms of the Agreement, Arbitrator Simmelkjaer had no authority to modify the provisions of the Agreement (Pet. Ex. 7, p. 9.); he was obligated to direct the parties to return to Interest Based Problem Solving to resolve the problems created by their failure to address the Night Shift Differential issue. Instead, the Arbitrator went outside the Agreement, and notwithstanding his findings that the Agreement was silent on the matter of Night Shift Differential for New Flextime Shifts, found that "the express contract language is clear and unambiguous" that RNs working the New Flextime Shifts at Kings Highway were entitled to a Night Shift Differential. (Pet. Ex. 8, p. 17.) The "express contract language" the Arbitrator found "clear and unambiguous" was not in the Agreement – the collective bargaining agreement between the Hospital and the Union from which the Arbitrator's power is "derived" and by which it is "limited." The "express contract language" upon which the Arbitrator relied appeared in the 1988, 1989 and 1991 MOAs – collective bargaining agreements between the Union and the old Kings Highway Hospital – that explicitly and by their own terms applied only to the flextime RNs in the 1988 Flextime Shifts at Kings Highway, not the New Flextime Shift RNs. (Pet. Ex. 8, p. 19.) By going to sources outside the Agreement in front of

12

him to add a provision on an issue on which the Agreement is silent, Arbitrator Simmelkjaer exceeded his power. The Award should therefore be vacated.

Courts vacate arbitral awards where the arbitrator exceeds his power by going outside the governing agreement and effectively adds provisions to the governing collective bargaining agreement based on past conduct. In Torrington Co. v. Metal Prods. Workers Union Local 1645, 362 F.2d 677 (2d Cir. 1966), a case with facts similar to those of the instant case, the arbitrator concluded that the employer's discontinuation of pay for time off to vote violated the applicable collective bargaining agreement, despite a finding that such pay was not provided for in the agreement. Id. at 679. The District Court vacated the arbitration award and the Second Circuit affirmed, holding that the arbitrator exceeded his authority by improperly basing his award on the parties' past conduct, which effectively added terms to the collective bargaining agreement that were not bargained for and that did not exist. Id. at 680. In Torrington, as in the instant case, the arbitrator found the collective bargaining agreement silent on the benefit at issue and he looked to sources outside the agreement for terms. Id. at 679. In affirming vacatur of the award, the Second Circuit in Torrington found the Arbitrator had "exceeded his authority by ruling that such a benefit was implied in the terms of [the] agreement." Id. at 682. So here, the Award should also be vacated because the Arbitrator exceeded his authority by ruling that payment of the Night Shift Differential to the New Flextime Shifts at Kings Highway was implied in the terms of the Agreement.

Similarly, in Leed Architectural, 916 F.2d 63, the agreement between the parties provided for a maximum $8.58 per hour wage rate for employees in the Fabricator position. Id.

13

at 64. Nonetheless, the arbitrator's award granted all Fabricators a $10 per hour wage rate based on his looking to the wage rate of one Fabricator who had been mistakenly paid the $10 rate. Id. at 65. The court concluded that the arbitrator "exceeded his authority in permitting [the $10] wage rate to stand and altering the bargained for and lawful rate of the grievants so as to match it." Id. at 66. This remedy contradicted the terms of the agreement, which stated that "the arbitrator had no authority to add to, subtract from or in any way modify its terms[.]" Id. at 64. As in Leed Architectural, the Arbitrator exceeded his power by adding a term to the Agreement based on matters outside the Agreement, and therefore the Award should be vacated.

**D.    The Union's Motion To Confirm The Award**
      **Should Be Denied Because The Union's Reliance**
      **On The 1988, 1989 And 1991 MOAs Is Flawed**

      1.     The Union's Argument That The Arbitrator Acted Within His Powers When
             He Relied On The 1988, 1989 And 1991 MOAs Lacks Merit

The Union mistakenly argues in its memorandum of law in support of its motion to confirm the Award that the Arbitrator "acted within the scope of his authority" because "the Award is firmly rooted in the Agreements" that the Union signed with BIMC's predecessor in 1988, 1989 and 1991. (Union Memorandum of Law p. 7, 9-10.) The flaw in this argument is that it asks the court to assume, incorrectly, that Arbitrator Simmelkjaer was merely interpreting an ambiguous term in the 2002 Agreement by reference to earlier agreements when, in fact, the Arbitrator, by his own admission, looked at old agreements between different parties to borrow a term that was entirely missing from the 2002 Agreement and on which he expressly found the Union and BIMC had not reached a meeting of the minds. Although an arbitrator may look to other sources to help interpret an existing provision in a collective bargaining agreement that may

14

be ambiguous, he may not rely on outside sources to provide a term that is missing altogether from the agreement. See Torrington, 362 F.2d at 680; Union Appointed Trustees, 714 F. Supp. at 106. When the controlling collective bargaining agreement is silent (as opposed to ambiguous) on a disputed issue, and the agreement contains specific language instructing the parties how to resolve problems created by omitted terms, the parties must follow the dispute resolution mechanism specified in their agreement. In this case, the Agreement directs the parties to "meet and develop a new solution to the problem using the Interest Based [Problem Solving] process." (Pet. Ex. 7, p. 9.) If the Arbitrator had "rooted" his decision in the Agreement, as he should have, he had only one choice – direct the parties to return to the IBPS process to develop a solution to the problem created by the missing term concerning shift differential. By ignoring the clear and unambiguous directive of the 2002 Agreement regarding problem solving, and instead borrowing the shift differential provision from the old MOAs, the Arbitrator exceeded his power under the 2002 Agreement. As a result, his Award should be vacated.

2.    The Union's Argument That The 1988, 1989 And 1991 MOAs Apply To All RNs Who Work Flextime Shifts At Kings Highway Lacks Merit

The Union argued before the Arbitrator and now agues before this Court that the 1988, 1989 and 1991 MOAs "provide for shift differential pay for [all] flex-shift employees at Kings Highway" regardless of when, under which terms, and by which agreement the "flex-shifts" are created. (Union Memorandum of Law p. 10.) This argument, which is the crux of the Union's position, is flawed for the following four reasons:

15

First, the Union's argument incorrectly implies that the terms of the 1988, 1989 and 1991 MOAs are written broadly to encompass any nurse who works a flexible shift. In fact, the MOAs were written narrowly to extend the flexible shift option to only a very few, specifically-named units within the Hospital. Thus, the agreement that first recognized the flexible shift concept – the 1988 MOA – provides that the flextime scheduling arrangements delineated therein apply to "Registered Nurses in the C.C.U. and I.C.U." (Pet. Ex. 1, p. 1.) The modifying agreements – the 1989 and 1991 MOAs – established Shift Differential for hours worked between 3:00 P.M. and 7:00 P.M., but only for the RNs who worked flextime shifts in existence at that time, that is RNs in the 1988 Flextime Shifts. (Pet. Ex. 2, p. 2; Ex. 3, p. 2.) None of these agreements indicate in any way that their provisions apply to any other RNs in any other unit. By their own terms, therefore, the MOAs only apply to flextime RNs in the Kings Highway 1988 Flextime Shifts. It is elementary that because the MOAs do not mention the New Flextime Shifts in 2 North, 3 East, or the SSU, they do not and cannot apply to RNs in the New Flextime Shifts.

Second, the Union's argument incorrectly suggests that the 2002 Agreement that created the New Flextime Shifts in 2 North, 3 East, and the SSU did so by simply expanding the list of Hospital units covered by the flexible shift provisions in the prior MOAs. Contrary to the Union's suggestion, the 2002 Agreement adopted an entirely new set of terms for establishing the New Flextime Shifts in the three new Hospital units and those terms varied in many respects from the terms governing the flexible shifts created by the MOAs. (Pet. Ex. 7, p. 5.) Nowhere in the Agreement do the parties indicate an intent to reach back to the old Kings Highway Hospital

16

MOAs for governing terms. (Pet. Ex. 7.) Thus, for example, the parties decided that the New
Flextime Shifts would be 11.5 hours in length, not the 12 hour shifts used in the pre-existing
units. (Pet. Ex. 7, Ex. 1.) In addition, lunch breaks are unpaid in the New Flextime Shifts,
contrary to the paid lunch breaks in the pre-existing units, and RNs in the New Flextime Shifts
work 13 shifts every four weeks, rather than the three shifts per week worked in the pre-existing
units. (Id.) These differences between the New Flextime Shifts and the pre-existing flexible
shifts reflect the parties' intent to make the 2002 Agreement the foundational document for
establishing the terms and conditions of the New Flextime Shifts. Nothing was borrowed from
the MOAs in creating them.

       Third, the Union erroneously suggests that the MOAs were the model for the New
Flextime Shifts and, building upon that error, asserts that it was not irrational for the Arbitrator to
borrow the missing term about shift differential from the MOA model for flexible shifts. In fact,
the New Flextime Shifts at Kings Highway were created by using the Petrie Division model for
flexible shifts, not the MOA model. (Pet. ¶ 16, Ex. 7.) Thus, like the flexible shifts already in
use in the Petrie Division when BIMC purchased Kings Highway, the New Flextime Shifts were
based on the "13, 11.5 hour shifts in 4 weeks model." (Pet. Ex. 7, p. 5.) The parties expressly
included in the 2002 Agreement provisions for 11.5-hour shifts, an unpaid half-hour lunch, and a
requirement that RNs work 13 flextime shifts every four weeks that directly contrast with those
in the old Kings Highway Hospital model of 12-hour shifts, a paid lunch, and a requirement that
RNs work three flextime shifts each week. This express use of the contrasting Petrie model in

establishing the New Flextime Shifts at Kings Highway shows the parties' intent to depart in

every significant respect from the old Kings Highway model established in the MOAs. [7]

        Fourth, the Union's position suggests that the MOAs govern the terms and

conditions for all RNs who work flextime shifts at Kings Highway, including in particular the

payment of Night Shift Differential. In taking this position, the Union ignores the agreement it

entered into with the Hospital in March 2007 to use the Petrie model to establish flextime shifts

in five new nursing units at Kings Highway (the "2007 Agreement"). (Suardy Decl. ¶ 5.) In

structuring the terms and conditions for flextime shifts in these five new units, the Union and the

Hospital expressly adopted the Petrie model, including payment of extra shift differential only for

RNs whose shifts are scheduled to end past 7:00 P.M. (Id.) In entering the 2007 Agreement, the

Union unequivocally agreed that five nursing units at Kings Highway will be governed by terms

and conditions as to Night Shift Differential that are different from the terms and conditions

governing the CCU and ICU nursing units. Thus the 2007 Agreement, like the 2002 Agreement,

contains different terms and conditions for nurses working flextime shifts than those found in the

1988, 1989, and 1991 MOAs. Moreover, the 2007 Agreement, like the 2002 Agreement and the

old MOAs, limits its reach to the flex shift RNs in specific named units. (Suardy Decl. ¶¶ 4, 6.)

The differences in terms governing the different flextime nursing units at Kings Highway

---

[7] The Union's argument that the old Kings Highway Hospital model should be used rather than
the Petrie model to fill in the one term on which the Agreement is silent – payment of Night Shift
Differential to dayshift flextime RNs at Kings Highway – is illogical. To arbitrarily assume that
the parties intended to reach back to an old agreement regarding different units for omitted terms,
even though the parties expressly and consistently displayed an intention to use Petrie model
terms, is irrational.

18

contradicts the Union's argument that the MOAs apply to, and set the terms for, all nurses at Kings Highway who work flextime shifts.

      3.      There Is No Merit To The Union's Argument The 2002 Agreement Had To Affirmatively "Negate" The Payment Of Shift Differential To Those In The New Flextime Shifts

      The Union argues that the New Flextime RNs' entitlement to the 3:00 P.M. to 7:00 P.M. Night Shift Differential "was not *eliminated* in the 2002 agreement" and that the "failure . . . to *negate* such pay" in the 2002 Agreement allowed the Arbitrator to impose that term on the parties. (Union Memorandum of Law p. 3, 10; emphasis supplied.) The Union's argument incorrectly assumes that, absent an explicit renunciation in the Agreement of the shift differential described in the 1989 and 1991 MOAs, all RNs working flextime shifts at Kings Highway in any Hospital unit will receive the night shift compensation specified in the MOAs. This argument is flawed because, as discussed above, the MOAs expressly apply only to the 1988 Flextime Shift nursing units and no others. This explicit and limited application of the MOAs to the 1988 Flextime Shifts precludes the MOAs' terms from expanding beyond those three units to cover units created by a later and very different collective bargaining agreement. Indeed, if the parties had intended the MOAs to apply to every present or future flextime unit at Kings Highway, they could have easily achieved this, either (i) by not identifying the specific units authorized to work flextime and stating broadly that the agreement applies to any units at Kings Highway that adopt flextime shifts or (ii) by stating that the terms in the MOAs apply to the 1988 Flextime Shift nursing units *and* any other units at Kings Highway that adopt flextime shifts in the future. The parties did not, however, include language that would allow the MOAs to apply

19

to other units as they were created. Thus, contrary to the Union's contention, the 2002

Agreement did not need to expressly "negate" the application of the MOAs night shift

differential to the New Flextime Units, nor did it need to "eliminate" the night shift differential

altogether to avoid paying it to RNs in the New Flextime Shifts. Instead, the 2002 Agreement

needed to do only what in fact it does – specify the new Hospital units that would be authorized

to hire RNs to work flextime shifts and dictate the terms and conditions under which flextime

would be worked on those new shifts in those new units. The fact that the Agreement omitted

one term – the starting point for payment of a night shift differential – simply proves, as the

Arbitrator found, that there was no meeting of the minds on that issue. It does not show that the

parties intended to adopt the night shift differential scheme from the MOAs.

4.    The Union's Argument That The Hospital Is Estopped From Arguing
      That The 1988,1989 And 1991 MOAs Are Inapplicable to New Flextime
      RNs Lacks Merit

        Equally without merit is the Union's argument that a 2001 arbitration award by a

different arbitrator (the "2001 Arbitration") "estops BIMC from claiming that the Kings Highway

[1988, 1989 and 1991 MOAs'] flex shift pay [provisions] do not apply" to the New Flextime

Shifts. (Union Memorandum of Law, p. 14.) The argument is fatally flawed because the issues

in the 2001 arbitration were substantively different from the issues in the arbitration at issue in

this case.

        In order to establish an estoppel, the Union must show that: (1) the issues in both

proceedings are identical, (2) the issue in the prior proceeding was actually litigated and actually

decided, (3) there was full and fair opportunity to litigate in the prior proceeding, and (4) the

issue previously litigated was necessary to support a valid and final judgment on the merits. Giles v. City of New York, 41 F. Supp. 2d 308, 313 (S.D.N.Y. 1999).[8] Failing to meet any one of these four elements is fatal to an estoppel argument. See Id. at 313-14 (denying estoppel argument because the plaintiff's did not have an opportunity to litigate in the prior arbitration).

The Union cannot establish the first element of its estoppel argument because the issues involved in the two arbitrations are not identical. The issue in the 2001 arbitration was whether the Hospital "improperly paid Registered Nurses who have worked 12-hours shifts under the Flex Schedule agreement in effect since May 29, 1988, for their meal periods." (Union Memorandum of Law, Ex. F, p. 2.) The 2001 arbitration focused on rights of RNs who worked flextime shifts in existence at Kings Highway in 2001 (the 1988 Flextime Shift nurses), and took place *before* the parties entered into the 2002 Agreement that established the New Flextime Shifts. The 2001 arbitration, therefore, could not possibly have addressed the issue of payment of Night Shift Differential to the New Flextime Shifts because the New Flextime Shifts, established in February 2002, did not yet exist.

The Union cannot establish the second element of its estoppel argument, because the entitlement to Night Shift Differential was not litigated or decided upon in the 2001 arbitration. The scope of the 2001 arbitration was limited to payment to nurses who worked in the 1988 Flextime Shifts at Kings Highway "for their meal periods." (Union Memorandum of

---

[8] Even if the Union were able to make this showing (which it cannot), estoppel is "not mandatory, because 'application of collateral estoppel from arbitral findings is a matter within the broad discretion of the district court.'" Id. (quoting Transaero, Inc. v. La Fuerza Aerea Boliviana, 162 F.3d 724, 731 (2d Cir. 1998)).

Law, Ex. F, p. 2.) Night Shift Differential was not part of the "issue" that the arbitrator in the 2001 arbitration expressly set forth and decided upon. (Id. at p. 7.) Thus, the Union's assertion that litigation regarding the Night Shift Differential issue is precluded by a prior arbitral decision on the issue of payment for meal periods lacks merit.

The Union also cannot establish the third element of its estoppel argument, because the parties did not have the opportunity to litigate the effect of Interest Based Problem Solving on a problem arising regarding the parties' 2002 Agreement. The Union and the Hospital agreed to adopt the IBPS process in May 2001 for use during bargaining of future agreements. (Pet. Ex. 5.) The parties' agreement to use Interest Based Problem Solving was, therefore, not in effect at the time they entered the 1988 MOA. Because the 1988 MOA does not contain an IBPS provision, and the parties did not agree to resolve problems that arose under the 1988 MOA using the IBPS process, the Hospital had no opportunity in the 2001 Arbitration to raise the issue that is at the heart of this case – whether Arbitrator Simmelkjaer was obligated to direct the parties to return to Interest Based Problem Solving when a problem arose regarding the New Flextime Shifts. The Hospital cannot be estopped from raising the IBPS issue in the instant case when it plainly did not have the opportunity to raise the issue in the 2001 Arbitration.

Because the issues raised in the Hospital's Petition are not identical to the issues that were, or could have been, litigated the 2001 Arbitration, the Union's estoppel argument lacks merit.

## POINT II

### THE ARBITRATION AWARD SHOULD BE VACATED BECAUSE IT DOES NOT CONFORM TO THE NEW YORK STATUTE OF FRAUDS AND IS THEREFORE CONTRARY TO PUBLIC POLICY

Courts may refuse to enforce any contract that violates law or public policy.

Newsday, Inc. v. Long Island Typographical Union, 915 F.2d 840, 844 (2d Cir. 1990), cert.

denied, 499 U.S. 922 (1991).  Similarly, courts will vacate an arbitration award when the "award

is clearly contrary to public policy."  Int'l Organization of Masters, Mates & Pilots v. Trinidad

Corp., 803 F.2d 69, 73 (2d Cir. 1986).  New York's Statute of Frauds is an example of a

"strongly held public policy."  Sen Mar, Inc., v. Tiger Petroleum Corp., 774 F. Supp. 879, 884

(S.D.N.Y. 1991).

New York's General Obligations Law §5-701(a)(1) (New York's codification of

the "Statute of Frauds") provides that an agreement which cannot be performed "within one year

from the making thereof" must be in writing.  The Statute of Frauds requires that the writing

contain all of the material terms of an agreement.  DeRosis v. Kaufman, 219 A.D.2d 376, 641

N.Y.S.2d 831 (1st Dep't 1996); Cohon & Co. v. Russell, 23 N.Y.2d 569, 297 N.Y.S.2d 947

(1969).  In addition, an unwritten agreement is void if it contains an obligation upon the parties

that is incapable of performance in one year.  Lehrer McGovern Bovis v. New York Yankees,

207 A.D.2d 256, 615 N.Y.S.2d 31, 33 (1st Dep't 1994).

The Agreement is silent on the issue of a Night Shift Differential for Kings

Highway RNs working the New Flextime Shifts that start at 7:00 A.M.  By finding that the

Hospital was obligated to pay Night Shift Differential to Kings Highway RNs working the

daytime flextime shift, while also finding that the Agreement was silent on that point, the

Arbitrator assumed the existence of an unwritten agreement between the parties.  When he

determined that the Hospital had an obligation to pay Kings Highway RNs from February 2002

until the current collective bargaining agreement expires in April 2011, the Arbitrator made the

unwritten agreement incapable of performance within one year.  Accordingly, the Statute of

Frauds bars the Arbitrator's finding, and the award must be vacated as contrary to public policy.

   The Union's reliance on <u>Beth Israel</u>, 2000 U.S. Dist. LEXIS 13547, for support of

its position that the Award does not violate the Statute of Frauds is misplaced.  In <u>Beth Israel</u> the

arbitrator found that the parties had reached an actual bargained-for agreement, albeit unwritten,

regarding the terms that were being enforced in the award, and had acted in accordance with that

agreement for an extended time, so that mere absence of a writing was not a bar to enforcing the

actual agreement he found existed.  <u>Id.</u> at *4-5, 10.  The guiding principle there, and in the cases

cited therein, is that if the parties reach an arm's length agreement as to terms, that agreement

does not need to comply with all of the technical rules of the Statute of Frauds to be enforceable.

<u>Id.</u> at *19.  In the instant case, however, the Arbitrator expressly found there was no meeting of

the minds between the parties regarding the payment of Night Shift Differential to New Flextime

Shift RNs.  The Arbitrator's creation of an unwritten provision binding on the parties where no

agreement between the parties existed violates the Statute of Frauds.

24

## CONCLUSION

For the foregoing reasons, the Hospital respectfully requests that its Petition to vacate the Arbitrator's Award be granted, and that the Union's motion for judgment confirming the Award and dismissing the Hospital's petition to vacate the award be denied, because the Arbitrator's decision requiring the Hospital to pay Night Shift Differential to Kings Highway RNs for work on the daytime flex shift exceeds the Arbitrator's power under the Agreement and violates public policy.

Dated: October 3, 2007
        New York, New York

                    EDWARDS ANGELL PALMER & DODGE LLP

                    By:_____
                        Jason R. Boghi
                        David R. Marshall
                        Attorneys for Beth Israel Medical Center
                        750 Lexington Avenue
                        New York, New York 10022
                        212.308.4411

25

EDWARDS ANGELL PALMER & DODGE LLP
David R. Marshall (DM-2924)
Jason R. Bogni (JB-3597)
Attorneys for Beth Israel Medical Center
750 Lexington Avenue
New York, New York 10022
212.308.4411

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BETH ISRAEL MEDICAL CENTER,

                    Plaintiff,

          - against -

1199/S.E.I.U. UNITED HEALTHCARE WORKERS
EAST, d/b/a LOCAL 1199/S.E.I.U. NATIONAL
HEALTH AND HUMAN SERVICE EMPLOYEES
UNION,

                    Defendant.

---

07 Civ. 6254 (MGC) (KNF)


**AFFIDAVIT OF SERVICE**

---

Jason R. Bogni, being duly sworn, deposes and says that he is over the age of eighteen; is not a party to this action; and that on the 3rd day of October 2007, he served a true copy of the foregoing MEMORANDUM OF LAW IN SUPPORT OF BETH ISRAEL MEDICAL CENTER'S PETITION TO VACATE ARBITRATION AWARD AND IN OPPOSITION TO 1199/S.E.I.U. UNITED HEALTHECARE WORKERS EAST'S MOTION FOR JUDGMENT CONFIRMING ARBITRATION AWARD AND DISMISSING EMPLOYER'S PETITION TO VACATE AWARD and upon:

**BARRY J. PEEK**
**MEYER, SUOZZI, ENGLISH & KLEIN, P.C.**
**1350 BROADWAY, SUITE 501**
**NEW YORK, NEW YORK 10018**

By electronically filing said document with the Electronic Court Filing system for the United States District Court, Southern District of New York, and by depositing a true copy of said document enclosed in a sealed wrapper, properly addressed to the above-named party, and causing it to be hand delivered to the above address.

_____
Jason R. Bogni

Sworn to before me this
3rd day of October 2007

_____
Notary Public

ANDRE K. CIZMARIK
NOTARY PUBLIC, State of New York
No. 01CI4970361
Qualified in Nassau County
Commission Expires 08/13/2010