```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
BETH ISRAEL MEDICAL CENTER,

                Petitioner,           OPINION

       -against-                      07 Civ. 6254 (MGC)


1199/S.E.I.U. UNITED HEALTHCARE
WORKERS EAST d/b/a LOCAL 1199/
S.E.I.U. NATIONAL HEALTH AND HUMAN
SERVICE EMPLOYEES UNION,

                Respondent.

-----------------------------------X


APPEARANCES:

        EDWARDS ANGELL PALMER & DODGE LLP
        Attorneys for Petitioner
        750 Lexington Avenue
        New York, New York 10022

        By:  David R. Marshall, Esq.
             Jason R. Bogni, Esq.


        MEYER, SUOZZI, ENGLISH & KLEIN, P.C.
        Attorneys for Respondent
        1350 Broadway, Suite 501
        New York, New York 10018

        By:  Barry J. Peek, Esq.
             Jordan Rossen, Esq.
```

1

**Cedarbaum, J.**

Beth Israel Medical Center ("BIMC") petitions to vacate an arbitration award rendered against it in a labor dispute with 1199/S.E.I.U. United Health Care Workers East ("Local 1199").  Local 1199 moves to confirm the arbitration award.  For the following reasons, BIMC's petition is denied, and Local 1199's motion to confirm the arbitration award is granted.

BACKGROUND

BIMC is a not-for-profit hospital operating in and organized under the laws of New York.  BIMC has a number of divisions, including the Petrie Division at First Avenue in Manhattan and the Kings Highway Division in Brooklyn, which was acquired in 1994, and was previously known as Kings Highway Hospital.  Local 1199, a healthcare employee labor union, is the exclusive bargaining representative for registered nurses (RNs) employed by BIMC, and was the bargaining representative for RNs employed by Kings Highway Hospital.  The dispute between BIMC and Local 1199 concerns wage "differentials," or wage supplements, for RNs on the flex schedule at BIMC's Kings Highway Division.

In 1988, Local 1199 and Kings Highway Hospital entered into a pilot agreement ("1988 MOA") that created a work week

2

schedule of three twelve-hour "flex-time" shifts for RNs working in the intensive care unit (ICU) and the critical care unit (CCU) of the hospital. This agreement provided for a nighttime wage differential for those working the 7 p.m. to 7 a.m. shift. The pilot program was extended in 1989 ("1989 MOA") and again in 1991 ("1991 MOA") with an additional wage differential between 3 p.m. and 7 p.m. on a pro-rata basis for RNs working the daytime 7 a.m. to 7 p.m. shift. In 1994, at the time of BIMC's purchase of Kings Highway Hospital, RNs in the ICU, CCU, and emergency department (ED) were on the flex-time schedule in accordance with the 1991 MOA, and they continued to receive pro-rata wage differentials after BIMC's acquisition.

BIMC's Petrie Division also instituted a twelve-hour flex-time plan prior to 1994. Under this Petrie plan, RNs on the flex-time schedule whose regular hours ended after 7 p.m. would receive a pro-rata wage differential for the hours worked after 7 p.m. While both plans provided for a wage differential for RNs working the 7 p.m. to 7 a.m. shift, only the Kings Highway plan provided for a pro-rata wage differential for RNs working the day shift from 3 p.m. to 7 p.m. Among other differences, the Kings Highway plan's twelve-hour shift included a thirty-minute paid lunch

period, whereas the Petrie plan included a thirty-minute unpaid lunch period.[1]

In 2001 the parties agreed to establish an interest-based negotiation process to develop a new labor agreement. Using this process, the parties reached an agreement on February 21, 2002 ("2002 MOA") which contained the following language with respect to the Kings Highway Division: "King's Highway – 2 North, SSU, 3 East (13, 11.5 hour shifts in 4 weeks model/12 hours inclusive of 30 minutes unpaid lunch)." The language in the agreement does not mention wage differentials, even though its provision for unpaid lunch appears to be in line with the Petrie Division plan. The 2002 MOA also limits its application to the 2 North, short stay unit (SSU), and 3 East nursing units. Following execution of this agreement, all RNs working the flex-time schedule at Kings Highway continued to receive the same nighttime and daytime (3 p.m. to 7 p.m. pro-rata) wage differentials through August 2005 as they had under the 1991 MOA. On August 7, 2005, BIMC discontinued the pre-7 p.m. day shift pro-rata wage differential payments for RNs in the

---

[1] BIMC challenged the paid lunch aspect of the Kings Highway plan in an arbitration proceeding, arguing that the language of the agreement did not specify that the lunch period was to be paid. On June 21, 2001, Arbitrator Richard Adelman found for Local 1199 and ordered the hospital to continue paying the RNs for the lunch break, as had been the practice since 1988.

4

2 North, SSU, and 3 East units, arguing that the 2002 MOA had adopted the Petrie Division plan with respect to wage differentials.  Local 1199 filed a grievance, which the hospital denied.  Local 1199 then filed a demand for arbitration of BIMC's alleged violation of the CBA.

The parties presented the arbitrator with the following questions: "Did the Employer violate the CBA when it ceased to pay night shift differential to Registered Nurses at the Kings Highway Division who worked the 7 a.m. to 7 p.m. flex schedule?  And, if so, what shall be the remedy?"  Arbitrator Robert T. Simmelkjaer found for Local 1199 in a detailed Opinion and Award dated March 6, 2007.  Based on findings that "the express contract language is clear and unambiguous" and that the differential benefit had been "clearly set forth" in MOAs since 1989, the arbitrator held that all RNs who worked the flex-time schedule at Kings Highway were entitled to the pro-rata wage differential for hours worked between 3 p.m. and 7 p.m.  The arbitrator determined that the lack of any specific language in the 2002 MOA regarding wage differentials compelled the conclusion that the long-standing practice and language of the 1989 and 1991 MOAs was unchanged, especially since other aspects, like the unpaid lunch time, were specifically altered in the 2002 MOA.  Accordingly, the arbitrator

ordered BIMC to pay the pro-rata portion of the wage differentials retroactively to August 7, 2005.

BIMC petitioned the Supreme Court of New York County to vacate the March 2007 arbitration award. Local 1199 removed the action to this court pursuant to 28 U.S.C. § 1441 and moved to dismiss BIMC's petition and confirm the arbitration award, order BIMC to pay the required back-pay plus interest to all affected employees, and award attorneys' fees to Local 1199 for the costs of this proceeding. The parties do not contest federal jurisdiction under § 301(a) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a), since the dispute concerns a CBA between an employer and a labor organization. Textile Workers Union of Am. v. Lincoln Mills of Ala., 353 U.S. 448, 455-57 (1957); Coca-Cola Bottling Co. of N.Y. v. Soft Drink & Brewery Workers Union Local 812, 242 F.3d 52, 54 (2d Cir. 2001).

DISCUSSION

I. Arbitration Award

Petitioner BIMC argues that the arbitrator exceeded his power by (1) ignoring a provision of the 2002 MOA that directs the parties to use interest-based negotiations in case the agreement fails to resolve a dispute, and (2) going

6

outside the agreement and adding a provision on which the agreement was silent.

Suits under LMRA § 301(a) are governed by federal common law.  Lincoln Mills, 353 U.S. at 456-57; Coca-Cola Bottling Co., 242 F.3d at 54.  Courts play a very limited role in reviewing a labor arbitration award and are "not empowered to reexamine the merits" of an award.  Int'l Bhd. of Elec. Workers, Local 97 v. Niagara Mohawk Power Corp., 143 F.3d 704, 714 (2d Cir. 1998).  "The refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements.  The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards."  United Steelworkers of Am. v. Enterprise Wheel & Car Corp., 363 U.S. 593, 596 (1960).

"An arbitrator's authority to settle disputes under a collective bargaining agreement is contractual in nature, and is limited to the powers that the agreement confers." Leed Architectural Prods., Inc. v. United Steelworkers of Am., Local 6674, 916 F.2d 63, 65 (2d Cir. 1990).  The arbitrator "'may not impose a remedy which directly contradicts the express language of the collective bargaining agreement.'"  Id. (quoting Bruno's, Inc. v.

7

United Food and Commercial Workers Int'l Union, Local 1657, 858 F.2d 1529, 1531 (11th Cir. 1988)).

"A party moving to vacate an arbitration award has the burden of proof, and the showing required to avoid confirmation is very high." D.H. Blair & Co. v. Gottdiener, 462 F.3d 95, 110 (2d Cir. 2006). "Only 'a barely colorable justification for the outcome reached' by the arbitrators is necessary to confirm the award." Id. (quoting Landy Michaels Realty Corp. v. Local 32B-32J, Service Employees Int'l Union, 954 F.2d 794, 797 (2d Cir. 1992)). "[A]n arbitrator's award is legitimate and enforceable as long as it 'draws its essence from the collective bargaining agreement' and is not merely an exercise of the arbitrator's 'own brand of industrial justice.'" Niagara Mohawk, 143 F.3d at 714 (quoting Enterprise Wheel, 363 U.S. at 597).

BIMC argues that the night shift differential issue was a "new problem," and that, based on the language in ¶ 5 of the 2002 MOA, the arbitrator should have ordered an interest-based negotiation process. The 2002 MOA provides that:

> 4. If either party fails to implement the solutions listed above that constitute modifications to the collective bargaining agreement either party shall have the right to seek expedited arbitration of the matter in accordance with AAA rules.

8

> 5. If the solutions set forth above, once implemented, do not enable the parties to reach their goals, or if a new problem pertaining to the issue statement is identified that requires resolution, the parties shall meet and develop a new solution to the problem using the Interest-Based process. Either party may raise issues relative to the solutions agreed upon herein at any time during the term of this agreement.  Anything in this Agreement to the contrary notwithstanding, absent a mutually agreeable resolution neither party is required to agree to, nor shall an arbitrator have the authority to order, a modification of the provisions of this Agreement.

The only language of ¶ 5 of the 2002 MOA that limits the powers of an arbitrator is the final sentence that denies an arbitrator authority to order a modification of the provisions of the agreement.  The language of ¶ 5 with respect to pursuing interest-based negotiations applies to the parties, not to a mutually agreed-upon arbitrator.  BIMC does not dispute the fact that Local 1199's decision to take the dispute to arbitration was within its rights under the agreement.  Any interest-based negotiation process should have preceded a decision to arbitrate, because such a decision is a "mutually agreeable resolution" contemplated by ¶ 5 of the 2002 MOA.  Once the matter was taken to arbitration, the arbitrator was well within his power to order that the differential be paid because the parties jointly submitted the question of wage differentials to the arbitrator, and because the language of ¶ 5 does not limit the arbitrator's remedies solely to ordering the parties to negotiate.  Since the arbitration award did not modify the parties' CBA, the arbitrator did not violate ¶ 5 of the 2002 MOA.

BIMC also argues that the arbitrator added a new provision to the agreement in his finding that the RNs in 2 North, SSU, and 3 East should be paid the differential from 3 p.m. to 7 p.m.  BIMC cites two cases to support its argument, <u>Torrington Co. v. Metal Products Workers Union Local 1645</u>, 362 F.2d 677 (2d Cir. 1966), and <u>Leed Architectural Products</u>, 916 F.2d 63.  Neither case is apposite.  In <u>Torrington</u>, the arbitrator's award was vacated

9

because it memorialized an employer's discontinued and unwritten practice of giving its employees time off with pay to vote.  362 F.2d at 681-82.  The award in Leed was vacated because the arbitrator forced the employer to pay a higher wage that was never bargained for and that was in itself a violation of the CBA.  916 F.2d at 66-67.  In both cases the arbitrator ratified a practice or approved a wage that was never bargained for in any agreement between the parties.  Here, however, the arbitrator found that the 2002 MOA did not change the previous wage differential established by the 1989 and 1991 MOAs.  Both the 1989 and 1991 MOAs extend the wage differential to "[t]hose registered nurses who work a 12 hour shift (flex time) which includes the hours of 3:00 p.m. to 7:00 p.m."  The language used in those MOAs applies generally to all RNs working the morning shift of the flex-time schedule, not just RNs working in specific units.  Since the 2002 MOA did not alter this provision in any way, the arbitrator did not force BIMC to pay a wage that it had not previously agreed to provide, and that it in fact provided through August 2005.  Thus, the arbitrator did not add a new provision to the agreement; rather, he enforced an existing, unaltered provision of the CBA.

BIMC makes note of a new agreement reached on March 29, 2007 ("2007 MOA") in which five new nursing units at the Kings Highway Division adopted provisions of the Petrie plan, including the absence of a wage differential before 7 p.m.  This agreement came after the arbitration award in question, and thus is not relevant in assessing the validity of the award.  However, if it were relevant, the 2007 MOA would support the arbitrator's reasoning that the provisions from the 1989 and 1991 MOAs would remain valid until altered because, unlike the 2007 MOA, the 2002 MOA did not expressly alter the wage differential arrangement.

The arbitrator neither exceeded his powers nor added a new provision to the CBA in ordering BIMC to pay the RNs in 2 North, SSU, and 3 East the 3 p.m. to 7 p.m. wage differential.

II. Statute of Frauds and Public Policy

BIMC argues that the arbitrator's award is contrary to public policy because it does not conform to New York's Statute of Frauds.  "[A] court may not enforce a collective-bargaining agreement that is contrary to public policy."  W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber, Cork, Linoleum & Plastic Workers of Am., 461 U.S. 757, 766 (1983).  "[A] court's task in reviewing an arbitral award for possible violations of public policy is limited to

10

determining whether the award itself, as contrasted with the reasoning that underlies the award, 'create[s] [an] explicit conflict with other laws and legal precedents' and thus clearly violates an identifiable public policy." Niagara Mohawk, 143 F.3d at 716 (quoting United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 43 (1987) (internal quotations omitted)).

    BIMC argues that because the issue of wage differentials was not mentioned in the 2002 MOA, the arbitrator assumed the existence of an unwritten agreement between the parties, which was then extended beyond a one-year period to the end of the CBA via the arbitration award. There is nothing about the arbitration award itself that violates the Statute of Frauds. Although it is not a contract subject to the Statute of Frauds, the award is nonetheless in writing and can be performed within one year of its making. Furthermore, the arbitrator relied on written agreements between the parties, namely the 1989 and 1991 MOAs, in making his decision. But even if BIMC were correct in asserting that the arbitrator assumed the existence of and relied on an unwritten agreement between the parties, the alleged unwritten agreement would not violate the Statute of Frauds because a CBA is enforceable even if it is unwritten. Am. Fed'n of Television & Radio Artists v. Inner City Broad. Corp., 748 F.2d 884, 887 (2d Cir. 1984).

    Thus, the arbitration award is not contrary to public policy.

CONCLUSION

    For the foregoing reasons, BIMC's petition to vacate the arbitration award is denied. Local 1199's motion to confirm the arbitration award is granted, and BIMC is directed to comply with the award.

    SO ORDERED.

Dated:    New York, New York
          January 16, 2008

                              S/_____
                                MIRIAM GOLDMAN CEDARBAUM
                              United States District Judge